**Roger BRASS, Plaintiff–Appellant,**

v.

**COUNTY OF LOS ANGELES, erroneously sued as Los Angeles County Board of Supervisors; Rick Thurlo, individually and as a peace officer, Defendants–Appellees.**

No. 01–57249.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 17, 2003.

Filed May 15, 2003.

Thomas E. Beck, Los Angeles, CA, for the plaintiff-appellant.

David J. Wilson, Los Angeles, CA; Denise M. Walter, Julie Fleming, Los Angeles, CA, for the defendants-appellees.

Before: FRIEDMAN,* KOZINSKI, and RAWLINSON, Circuit Judges.

## OPINION

FRIEDMAN, Circuit Judge.

The appellant Roger Brass challenges the district court's order granting summary judgment in favor of the County of Los Angeles ("County") on his complaint that the County violated 42 U.S.C. § 1983 by continuing his incarceration for 39 hours after a state trial judge had ordered him released. We affirm.

I

A. The relevant facts are undisputed. County Sheriff Deputy Thurlo was seeking to arrest James Nichols on a warrant for vehicular burglary. Brass's house was shown in the warrant as Nichols's address. Nichols reportedly had been seen near the house. Brass resembled Nichols's physical description, and both men had missing left-hand finger joints. On Sunday, April 6, 1997, Thurlo arrested and incarcerated Brass in the mistaken belief that he was Nichols.

Later that day, after Thurlo had left the station house, it was determined that Brass was not Nichols. The Sheriff's Department, however, continued to hold Brass and did not present him for arraignment until April 9, 1997, when, at 11:20 a.m., a state court judge ordered him released. The order, on a printed form, was directed to the County Sheriff, and stated in pertinent part:

THIS IS TO AUTHORIZE YOU TO RELEASE Brass, Roger ... FROM CUSTODY FOR THE FOLLOWING REASON Released on O/R, This Case Only.

The court's docket covering a case against Nichols further stated: "Request to Release on OR granted. Respondent released on own recognizance ... return on above date to be fingerprinted. Court indicates this may not be defendant in custody."

Although Brass stated in his brief that the order directed that he be released "forthwith," neither the release order nor the docket entries specified any time limit for his release.

Brass was released 39 hours after the release order was entered, at 3:00 a.m. on Friday, April 11. This 39-hour period for effecting his release is the gravamen of the case now before us.

B. Brass filed a suit for damages in the United States District Court for the Central District of California, naming as defendants the County, Thurlo and "DOES 2 through 100." His amended complaint contained six counts. The first three were federal claims, all alleging violation of 42 U.S.C. § 1983. Count I charged all the defendants with depriving Brass of his liberty without due process and alleged that

---

* Daniel M. Friedman, Senior United States Circuit Judge for the Federal Circuit, sitting by designation.

the "conduct ... was undertaken pursuant to the policies, practices and customs of the Los Angeles Sheriff's Department." Count II alleged that the defendants had subjected him to unreasonable searches and seizures, in violation of the Fourth Amendment. Count III, which charged only the County, alleged that Thurlo and the DOES had enforced the County's "policies, customs, practices and usages in violation of the Fourth and Fourteenth Amendments." (This claim will be referred to as the *Monell* claim, as the parties do, based on *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), discussed in Part III, below.) The fourth through sixth counts all stated claims under California law. The complaint stated that each DOE defendant "is responsible in some manner for the events and happenings herein referred to, and thereby proximately caused injuries and damages as herein alleged"; and that Brass did not know the DOES' "true names and capacities," but would seek to amend the complaint "to show their true names and capacities when same have been ascertained."

On the defendants' motion, the district court granted summary judgment dismissing the three federal claims and, declining to exercise supplemental jurisdiction, dismissed the state law claims without prejudice. The court dismissed the first claim against Thurlo because Brass had not shown that Thurlo was responsible for his continued detention after the state court had ordered his release. The court rejected Brass's unlawful arrest claim (Count II) because Thurlo had probable cause to arrest him, and therefore was entitled to qualified immunity. The court also dismissed Counts I and II against the County because the County could not be held liable under Section 1983 on a respondeat superior liability theory. Finally, the court granted summary judgment dismissing Count III, the *Monell* claim that the

39–hour detention resulted from a County policy or custom, on the ground that the County Sheriff acted as a state rather than as a county official in handling the release of prisoners.

On appeal, we affirmed the summary judgment in favor of Thurlo, but reversed the judgment in favor of the County. *Brass v. County of L.A.,* 10 Fed.Appx. 412, 2001 WL 275076 (9th Cir. Mar.19, 2001) (unpublished opinion). We held that Thurlo had probable cause to arrest Brass, and therefore qualified immunity. With respect to Brass's claim that the County "violated his constitutional rights when it failed to release him from jail until April 11, even though a judge ordered his release on April 9," we relied on our decision in *Streit v. County of Los Angeles,* 236 F.3d 552, 561 (9th Cir.2001), where we held that "when the Sheriff of Los Angeles County performs the function of 'oversight and management of the local jail,' including, specifically, the effectuation of the release of prisoners, the 'Sheriff acts for the County,' and not the state.... As a result, the County can be liable for Brass's delayed release and, therefore, the district court's summary judgment for the County must be reversed. We express no opinion on the merits of Brass' claim of untimely release." *Id.* at *3–5 (quoting *Streit,* 236 F.3d at 561).

C. On the remand, Brass moved for summary adjudication, and the County moved for summary judgment. In support of his motion, Brass asserted, in addition to his "policy or custom" claim against the County, "three additional bases to support his Section 1983 action," including the County's failure to arraign him timely. Brass previously had not explicitly made these three additional claims.

Brass also attempted to substitute four named County police officers for four of the DOES. Those officers allegedly had

been involved in his 39–hour incarceration. He did not, however, move to amend his complaint to add those individuals as named defendants, but merely referred to them as defendants in various documents he filed.

The district court denied Brass's motion, granted the defendant's motion and dismissed the case. The court first held that the only issue properly before it was Brass's *Monell* claim against the County. It pointed out that it had initially granted summary judgment in favor of both Thurlo and the County; that we reversed only the ruling that the County was not liable on the *Monell* claim because the Sheriff acted as a representative of the state and not the County in handling the release of prisoners "thus leaving intact [its] findings that the County was not liable under Plaintiff's first two Section 1983 causes of action (for due process violations and unlawful arrest)"; and concluded therefore that the *Monell* claim "is the only viable federal claim before [it]." The district court then ruled that, because Brass had not previously "asserted" the additional claims he now sought to litigate, he had waived them.

Finally, the court held that it would be "inappropriate" to substitute the four named parties for the four DOE defendants, "especially" because Brass "has not even attempted to request leave from the Court to add new parties or to file an amended complaint. Plaintiff cannot take advantage of the Ninth Circuit's limited remand by now adding these new individuals to the litigation. Thus, the naming of these individuals as defendants and any allegations pertaining to them as named defendants are stricken."

The court denied Brass's motion for summary adjudication in his favor that the County violated his constitutional rights through its practice and custom of delaying his release for 39 hours "because he

has failed to carry his burden of showing that this policy was actually applied to him in the instant case. Mere conclusory statements that this practice 'caused [his] detention,' without more, does not constitute evidence sufficient to establish a nexus between the 'policy' and Plaintiff's detention." The court concluded: "Because Plaintiff's 39–hour detention is within the presumptive constitutional time limit of 48 hours set by the *McLaughlin* court[discussed below] and because Plaintiff has not raised a genuine issue of material fact that his release was otherwise unreasonably delayed, Defendants' motion on Plaintiff's sole remaining Section 1983 cause of action alleging Fourth and Fourteenth amendment violations for overdetention is GRANTED."

Finally, the court again dismissed without prejudice Brass's state law claims.

## II

The district court correctly held that the only issue properly before it was the validity of Brass's *Monell* claim against the County.

A. As noted, Brass's amended complaint contained three federal law counts. Count I charged all defendants (the County, Thurlo, and the DOES) with depriving Brass of his liberty without due process of law "pursuant to the policies, practices and customs" of the County's Sheriff's Department, and Count II, also directed against all the defendants, with subjecting him to unreasonable searches and seizures. Count III, which set forth the *Monell* claim, was asserted only against the County, and alleged that the County employees enforced against Brass County "policies, customs, practices and usages in violation of the Fourth and Fourteenth Amendments." The district court granted summary judgment dismissing these three counts.

In the prior appeal, we held that Thurlo had probable cause to arrest Brass and that he therefore "ha[d] qualified immunity and is not liable for the arrest under 42 U.S.C. § 1983." *Brass,* 10 Fed.Appx. 412, 2001 WL 275076, at *3 (unpublished opinion). We affirmed the district court's summary judgment in favor of Thurlo. *Id.* at *5. We reversed the summary judgment in favor of the County, however, because it was based on the erroneous ground that the Sheriff acted for the state in handling the release of prisoners. We held that in performing those duties the Sheriff acted for the County, which "can be liable for Brass's delayed release." *Id.* at *4.

Since Claims I and II were asserted against both the individual defendants and the County, with only Claim III solely against the County, it would appear that on the remand all three claims were extant against the County. In fact, however, only Count III—the *Monell* count—remained viable.

As we explain in Part III A, below, the only basis upon which a valid claim under § 1983 may be asserted against the County is under the "policy or custom" theory of *Monell.* Claim III states the *Monell* theory. Although Count I, which alleges the defendants denied Brass his liberty without due process, states that the defendants' conduct "was undertaken pursuant to the policies, practices and customs of the Los Angeles Sheriff's Department," the only "policies, practices and customs" upon which Brass's claims are based are those relating to the way in which prisoners are released from confinement. See below Part III B.

Thus, the claims against the County in Count I are based upon the same facts and theories as Count III. Count II, which apparently contends that Brass's arrest violated his Fourth Amendment right to be free from unreasonable searches and seizures, does not contend that the arrest was made pursuant to the County's policy or custom. Moreover, we rejected that claim in the prior appeal when we held that Thurlo had probable cause for the arrest.

In sum, only the *Monell* theory in Count III remained in the remanded case.

 B. The district court also properly refused to permit Brass to assert the three additional arguments he sought to raise in support of his § 1983 claim. He contended that the County had denied him due process by failing (1) to arraign him promptly after his arrest, (2) to release him promptly after determining that he was not Nichols and (3) to comply with a state court injunction in another case that allegedly prohibited the practices the County followed in releasing him. The district court held that because Brass had not asserted those claims in the earlier stages of this litigation, either before it or on appeal, he had waived them.

We agree. Nothing in Counts I–III of the amended complaint even suggests that Brass was raising those issues. Furthermore, Brass has offered no excuse or justification for his failure to raise them earlier. The decision whether to permit such a belated attempt to expand a complaint lies within the discretion of the district court. *See Chodos v. W. Publ'g,* 292 F.3d 992, 1003 (9th Cir.2002). The district court did not abuse its discretion in refusing to allow Brass thus to broaden his case.

 C. Finally, the district court did not err in refusing to permit Brass to substitute four individual members of the Sheriff's Department for four of the DOES in his amended complaint. In that complaint he stated that when the "true names and capacities" of the DOES, which he then did not know, were ascertained, he "will seek leave to amend th[e] Complaint" to name them. In refusing to permit the addition of those individual defendants, the

district court pointed out that Brass "has not even attempted to request leave from the Court to add new parties or to file an amended complaint. Plaintiff cannot take advantage of the Ninth Circuit's limited remand by now adding these new individuals to the litigation." The district court did not abuse its discretion in precluding Brass from thus expanding his suit. *See Percy v. San Francisco Gen. Hosp.,* 841 F.2d 975, 978 (9th Cir.1988).

## III

A. Brass's "policy or custom" claim is based upon *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the Supreme Court held that municipal corporations were not subject to liability under § 1983. In *Monell,* 436 U.S. at 665, 98 S.Ct. 2018, the Court, based upon its "fresh" review of the legislative history of the Civil Rights Act of 1871 (the statutory predecessor to § 1983), "overrule[d] *Monroe v. Pape* . . . insofar as it holds that local governments are wholly immune from suit under § 1983." *Id.* at 663, 98 S.Ct. 2018 (footnote omitted). The Court, however, upheld *Monroe* "insofar as it holds that the doctrine of *respondeat superior* is not a basis for rendering municipalities liable under § 1983 for the constitutional torts of their employees." *Id.* at 663 n. 7, 98 S.Ct. 2018. It stated that "the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691, 98 S.Ct. 2018.

It announced the following standard governing the liability of a municipality under § 1983:

[A] local government may not be sued under § 1983 for an injury inflicted sole-

ly by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 694, 98 S.Ct. 2018. Although *Monell* dealt with a municipal government's liability under § 1983, the standard there announced was more broadly framed in terms of "a local government." Both the Supreme Court and we have recognized that the *Monell* standard governs a county's § 1983 liability. *McMillian v. Monroe County,* 520 U.S. 781, 783, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997); *Streit,* 236 F.3d at 564.

B. The "policy or custom" of the County upon which Brass primarily bases his § 1983 claim is that it processes releases of prisoners pursuant to court order only after it has completed the processing of all other inmates scheduled for release on that day. He also appears to challenge the County's practice of not beginning the processing of releases until all information relating to the prisoners scheduled for release on a particular day has been received and entered into the computer system. Most of the discussion that follows, although framed in terms of his main contention, also covers his secondary argument.

To evaluate the argument, it is necessary to consider how the County generally handles the release of its prisoners.

In *Streit,* we described the Sheriff's Department's practice in releasing inmates as follows:

the LASD [Sheriff's Department] conducts a check of . . . a computerized law enforcement database[ ] to confirm that the prisoner is not wanted by any other law enforcement agency. It is the

LASD's policy, however, to run the ... check only after all wants and holds that arrive on the day a prisoner is scheduled for release are inputted into the database. Due to the high volume of wants and holds received each day, the inputting process can, and often does, take between one to two days to complete. It is only after the inputting process is complete and the computer check run, that the LASD begins the administrative steps toward a prisoner's release. Although no longer required to serve time, these prisoners must remain in jail during the inputting period, extending their incarceration beyond their release date.

*Streit,* 236 F.3d at 556.

The Inmate Reception Center of the Los Angeles County Sheriff's Department ("Sheriff's Department") processes all inmate entrances and releases for the County. Decl. of Lt. Sneed of Sheriff's Dep't ¶ 2. The Sheriff's Custody Division operates the jails, and books and releases close to 600 inmates per day, an average of more than 200,000 inmates annually. *Id.* ¶ 3. Many inmates in the County jail system are repeat and/or serious offenders. *Id.* ¶ 4. Law enforcement and other government agencies frequently ask the Inmate Reception Center to place "holds" on a particular inmate's release. *Id.* Upon receipt, these holds are processed and put into the jail computer system. *Id.* The system is updated continually, with the largest amount of information from the courts arriving at the end of the day. *Id.*

The Inmate Reception Center receives from the forty-two courts in the County 3,000 to 5,000 documents daily. *Id.* ¶ 5. Each document is read individually, routed and entered into the computer system; approximately seventy clerks work day and night on this task. *Id.* Before releasing an inmate, the Sheriff's Department makes a record check that includes a review of all "wants" and "holds" received on a prisoner's scheduled release date. *Id.* ¶ 7.

The Sheriff's Custody Division does not authorize an inmate's release "until each and every piece of paper received from all the courts countywide has been interpreted, routed, and inputted into AJIS [the Automated Justice Information System]" and a check is made to determine there are no wants or holds precluding release. *Id.* ¶ 7. Inmates are released from the Central Jail; those detained elsewhere are transferred to the Central Jail for release. *Id.* ¶ 8. It generally takes from twenty-four to forty-eight hours to process an inmate's release. *Id.* ¶ 8. On those rare occasions when a judge orders an inmate released "directly from court," however, the inmate is so released after phone contact with the Inmate Reception Center. *Id.* ¶ 9.

Brass challenges the order in which releases are processed. He complains that the Sheriff's Department processes judicially-ordered releases at the end of the processing day, only after it has processed all other releases, i.e., prisoners who have completed their sentences or whom the Sheriff's Department has determined administratively should be released.

■ We have defined broadly "policy" for purposes of a *Monell* claim as "a deliberate choice to follow a course of action ... made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Fairley v. Luman,* 281 F.3d 913, 918 (9th Cir.2002) (per curiam) (citation and internal quotation marks omitted). The County does not question that its processing of court-ordered releases at the end of the processing day constitutes a "policy or custom" under *Monell.* Assuming without deciding that is so, we agree with the district court that Brass has not stated a valid claim under

§ 1983 because that "policy or custom" did not violate Brass's constitutional rights.

What Brass is raising is an issue of priority: he challenges the order in which the Sheriff's Department processes prisoners for release. To whatever extent he could establish that his release should have been effectuated before that of other prisoners, their release correspondingly would have been delayed. Moreover, even if Brass could prevail in his contention that his release should have been processed earlier on his release date, the result would have been only to shorten the 39–hour delay in releasing him. It could not have eliminated the delay; it would have reduced it by an indeterminable amount dependent upon where in the processing chain he was reached.

Brass may have had a due process right to be released within a reasonable time after the reason for his detention ended. *See Baker v. McCollan,* 443 U.S. 137, 144–46, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Oviatt v. Pearce,* 954 F.2d 1470, 1474 (9th Cir.1992) (citation omitted) ("[A]n individual has a liberty interest in being free from incarceration absent a criminal conviction."). The question here, however, is whether the County denied him that right because its policy or custom of processing court-ordered releases only after it has processed all other releases increased by an indeterminate amount the delay between the court order and his actual release.

Brass did not have a constitutional right to have his release papers processed in any particular order or ahead of other prisoners whose papers the Sheriff's Department received the same day as his. The order in which the Sheriff's Department handles prisoner releases is an administrative matter primarily within the Department's discretion. We know of no requirement, constitutional or otherwise, that the Department process

release papers in the precise order in which it receives them, or process court-ordered releases ahead of all others. In these circumstances, we cannot say that to the extent that the 39–hour delay in releasing Brass resulted from that policy or custom, it violated his constitutional right to due process of law.

Our conclusion finds support in *Baker,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433. There, as here, a man was arrested on a valid warrant in the mistaken belief that he was the person described in the warrant. *Id.* at 141, 99 S.Ct. 2689. He was imprisoned for seventy-two hours over a weekend. *Id.* When county officials became aware thereafter of the mistaken identity, the plaintiff was released. *Id.* He then sued the Sheriff under § 1983 for deprivation of liberty without due process of law. *Id.*

The Supreme Court held that because McCollan had "been deprived of no rights secured under the United States Constitution, respondent had no claim cognizable under § 1983." *Baker,* 443 U.S. at 146–47, 99 S.Ct. 2689. The Court stated that "a public official is liable under § 1983 only if he *causes* the plaintiff to be subjected to deprivation of his constitutional rights," *id.* at 142, 99 S.Ct. 2689 (citation and internal quotation marks omitted), and that "[s]ection 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Id.* at 146, 99 S.Ct. 2689. The Court held that the deprivation of liberty McCollan suffered because of his imprisonment did not deny him due process of law because:

A reasonable division of functions between law enforcement officers, committing magistrates, and judicial officers-all of whom may be potential defendants in a § 1983 action-is entirely consistent with "due process of law." Given the

requirements that arrest be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent. Nor is the official charged with maintaining custody of the accused named in the warrant required by the Constitution to perform an error-free investigation of such a claim. *Id.* at 145–46, 99 S.Ct. 2689.

This holding was followed by the Seventh Circuit in *Lewis v. O'Grady*, 853 F.2d 1366 (7th Cir.1988), where plaintiff was arrested on a valid warrant issued for another person. *Id.* at 1367–68. The plaintiff was imprisoned for eleven additional hours after a judge determined that he was not the man named in the warrant. *Id.* at 1368. He sued the Sheriff (and others) for false arrest and imprisonment, based on that eleven-hour delay. *Id.* Although the Seventh Circuit ruled that the district court erroneously had granted a directed verdict for the Sheriff-because in the circumstances the reasonableness of the eleven-hour delay in releasing him was for the jury to determine-it "recognize[d] that the administrative tasks incident to a release of a prisoner from custody may require some time to accomplish-in this case perhaps a number of hours. Reasonable time must be allowed for such matters as transportation, identity verification, and processing. It is virtually impossible to establish an absolute minimum time to meet all potential circumstances which might exist." *Id.* at 1370.

To the extent Brass's claim rests on the County's policy or custom of not starting to process a particular day's releases until it has received all information, including wants and holds, relating to the prisoners scheduled for release, we cannot say the County thereby violated Brass's constitutional rights. To the contrary, we think that that aspect of the County's release program was justified and reasonable in light of the County's problems and responsibilities in processing the large number of prisoner releases it handles.

In dismissing this case, the district court relied significantly on the fact that the 39–hour delay here was less than the 48–hour delay that the Supreme Court had sanctioned in *County of Riverside v. McLaughlin,* 500 U.S. 44, 58–59, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991).

*McLaughlin* involved the permissible delay between a warrantless arrest and a probable cause determination. The Court there stated: "In *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), this Court held that the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention following a warrantless arrest. This case requires us to define what is 'prompt' under *Gerstein.*" 500 U.S. at 47, 111 S.Ct. 1661. The Court stated that "some delays are inevitable" where jurisdictions "incorporate probable cause determinations into other pretrial procedures. . . . [T]here will be delays caused by paperwork and logistical problems. Records will have to be reviewed, charging documents drafted, appearance of counsel arranged, and appropriate bail determined. On weekends, when the number of arrests is often higher and available resources tend to be limited, arraignments may get pushed back even further." *Id.* at 55, 111 S.Ct. 1661. The Court concluded:

> a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness require-ment of *Gerstein.* For this reason, such

jurisdictions will be immune from systemic challenges.

This is not to say that the probable cause determination in a particular case passes constitutional muster simply because it is provided within 48 hours. Such a hearing may nonetheless violate *Gerstein* if the arrested individual can prove that his or her probable cause determination was delayed unreasonably. Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake. In evaluating whether the delay in a particular case is unreasonable, however, courts must allow a substantial degree of flexibility. Courts cannot ignore the often unavoidable delays in transporting arrested persons from one facility to another, handling latenight bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, and other practical realities.

*Id.* at 56–57, 111 S.Ct. 1661.

The Court's ruling that a judicial determination of probable cause within 48 hours of arrest generally will pass constitutional muster reflects the reality that "some delays are inevitable," such as those "caused by paperwork and logistical problems." *Id.* at 55, 111 S.Ct. 1661. For that reason, the Court concluded that "the Fourth Amendment permits a reasonable postponement of a probable cause determination while the police cope with the everyday problems of processing suspects through an overly burdened criminal justice system." *Id.*

As shown above, similar "delays are inevitable" "while the police cope with the everyday problems of processing" the County's release of a large number of prisoners. *See also Streit,* 236 F.3d at 556. It therefore appears that "the Fourth Amendment [and the Fourteenth Amendment] [similarly] permit[ ] a reasonable postponement" of a prisoner's release "while the [County] cope[s] with the everyday problem of processing" the release of the large number of prisoners who pass through its incarceration system. *See McLaughlin,* 500 U.S. at 55, 111 S.Ct. 1661.

It is unclear, however, whether the 48–hour period applied to probable cause determinations is appropriate for effectuating the release of prisoners whose basis for confinement has ended. One might conclude that when a court orders a prisoner released—or when, for example, a prisoner's sentence has been completed—the outer bounds for releasing the prisoner should be less than 48 hours. We need not determine that question here, however, since we have concluded that in the circumstances of this case, the 39–hour delay in releasing Brass was reasonable and did not violate his constitutional rights.

AFFIRMED.