W.E. GREEN, Plaintiff,

v.

Leroy BACA, Michael Antonovich, Yvonne Burke, Deane Dana, Don Knabe, Gloria Molina, Zev Yaroslovsky, and Ten Unknown Named Defendants, Defendants.

No. CV 02–04744 MMM (MANx).

United States District Court,
C.D. California.

Feb. 20, 2004.

Marion R. Yagman, Stephen Yagman, Kathryn S. Bloomfield, Joseph Reichmann, Yagman & Yagman & Reichmann & Bloomfield, Venice Beach, CA, for plaintiff.

Jeremy Warren, David D. Lawrence, Franscell, Strickland, Roberts & Lawrence, Glendale, CA, for defendants.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MORROW, District Judge.

This action concerns plaintiff's alleged overdetention at the Los Angeles County Jail for a period of seven and a half days in July 2001. Defendant Leroy Baca is the Los Angeles County Sheriff, and has exclusive responsibility for running the County Jail.[1] Plaintiff Billie Earl Green was arrested by his parole officer, Sebastian Minjarez, on June 4, 2001, for violating his parole. He was released from jail in the early morning hours of July 14, 2001. Plaintiff alleges that defendant knew he was entitled to release on July 6, 2001, but, pursuant to Sheriff's Department policy, did not release him until July 14, 2001. Plaintiff brings a claim under 42 U.S.C. § 1983 for violation of his federal constitutional rights, and seeks to hold Baca liable pursuant to *Monell v. Dep't of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Before the court is defendant's motion for summary judgment or, alternatively, for partial summary judgment on certain issues.

**I. FACTUAL BACKGROUND**[2]

On June 4, 2001, plaintiff was arrested by his parole agent, Sebastian Minjarez, for failing to register as a sex offender.[3] He was booked into the custody of the Los Angeles Sheriff's Department ("LASD"), and housed in the Los Angeles County Jail.[4] Sometime in the morning or early afternoon of July 6, 2001,[5] a hearing was held inside the jail before the Board of Prison Terms ("BPT"), regarding possible revocation of plaintiff's parole.[6] A BPT hearing officer declined to revoke plain-

---

1. See Cal. Gov't. Code § 26605; *Streit v. County of Los Angeles*, 236 F.3d 552, 567 (9th Cir.2001).

2. The following facts are undisputed unless otherwise noted.

3. Defendant's Separate Statement of Uncontroverted Facts and Conclusions of Law ("Def.'s Facts"), ¶ 3; Plaintiff's Statement of Controverted Facts ("Pl.'s Facts") ¶ 3. While the parties dispute the Penal Code section plaintiff allegedly violated, they agree that the state detained plaintiff pursuant to a parole hold. See Cal. Pen. Code § 3056 ("Prisoners on parole shall remain under the legal custody of the department and shall be subject at any time to be taken back within the inclosure of the prison").

4. Def.'s Facts, ¶ 4; Pl.'s Facts, ¶ 4.

5. The hearing took place prior to 1:34 p.m. on July 6, as this is the time the Department of Corrections sent a teletype authorizing plaintiff's release. Plaintiff's Exhibits ("Pl.'s Ex."), Ex. 6.

6. Pl.'s Facts, ¶ 7; Pl.'s Ex. 5.

tiff's parole, finding that there was insufficient evidence that he had violated his parole.[7] A report of the revocation hearing, signed by the hearing officer, indicates that plaintiff's parole hold was to be released "no later than 7–6–2001." [8] It is the responsibility of the Department of Corrections to notify the LASD that a parolee is to be released.[9]

On July 6, 2001, the Department of Corrections sent a teletype to LACJ–HPI/III, Attn. Jailer, authorizing plaintiff's release.[10] Plaintiff's parole officer, Minjarez, testified that, where the BPT directs that a parole hold be released, it is his usual practice to fax a message to the Department of Corrections following the hearing advising of this fact.[11] He stated that the Department of Corrections then informs the agency holding the parolee of the release order by sending a teletype.[12] Rebecca Hernandez, Minjarez's supervisor at the time of plaintiff's overdetention, explained this process somewhat further. She testified that after a parole hold is released, the parole agent faxes a release form to "Teletype," which "send[s] the release" to the supervisor. If it is in order, the supervisor signs the release, and the

parole agent then faxes it to headquarters.[13] Thereafter, Hernandez stated, a teletype authorizing the release of the parole hold is sent to the county jail on the CLETS system.[14] A parolee is supposed to report to the parole office within twenty-four hours after release from jail.[15] If the parolee does not report, the parole agent contacts the jail to ensure that the parolee has been released; if he has not, the agent completes another release form and sends it to the jail.[16]

As noted, plaintiff was ordered released on July 6, 2001. The following day, he was still in jail, and advised the watch sergeant that he had been ordered released.[17] The watch sergeant said he would check on whether plaintiff's parole hold had been released, and told plaintiff that "it takes a while to catch up with the system." [18] Plaintiff also called his parole officer on July 7, 2001, and was told he had been released.[19] Every day thereafter until his release, plaintiff called his parole officer.[20] Each time, plaintiff told the parole officer he was still in jail, and the parole officer responded that the parole office had "released" him.[21] Plaintiff asserts that he also completed a grievance form addressed to "classification" inquiring why he had not been released.[22] No copy of the form is in the record, however.[23] Plaintiff further

7. *Id.*

8. *Id.*

9. Def.'s Facts, ¶ 5; Pl.'s Facts, ¶ 5.

10. Pl.'s Ex. 6.

11. Pl.'s Ex. 2 (Minjarez Depo.) at 36:23–37:1, 38:16–24, 40:11–21.

12. *Id.* at 41:12–23.

13. Pl.'s Ex. 3 (Hernandez Depo.) at 13:11–14:6.

14. Hernandez initially testified that she had "no idea" how the teletype was sent. Later, she stated that it was sent on the CLETS system. (See *id.* at 14:7–15:24, 16:5–17:20.) CLETS is an acronym for California Law Enforcement Telecommunications System. See

*People v. Martinez,* 22 Cal.4th 106, 113, 91 Cal.Rptr.2d 687, 990 P.2d 563 (2000).

15. Hernandez Depo. at 23:18–19.

16. *Id.* at 24:6–22.

17. Pl.'s Ex. 8 (Green Depo.) at 49:14–17.

18. *Id.* at 49:23–25.

19. *Id.* at 52:17–23.

20. *Id.* at 53:1.

21. *Id.* at 53:7–23.

22. *Id.* at 54:9–23.

23. *Id.* at 54:25. Plaintiff also contends he filed an earlier grievance, during the first

contends he told two LASD deputies that the parole office had released his hold.[24]

On July 13, 2003, at 12:44 p.m., Rebecca Marbra, a supervising clerk at the Inmate Reception Center ("IRC") of the Los Angeles County Jail, received a facsimile that incorporated a teletype message releasing the hold on plaintiff's parole.[25] That same day, Marbra contacted plaintiff's parole agent, Sebastian Minjarez, to confirm that plaintiff's release was authorized.[26] Minjarez confirmed that plaintiff should be released,[27] and Marbra made a handwritten notation on the facsimile to this effect.[28] Plaintiff was released approximately twelve and one half hours after IRC received the facsimile authorizing his release on July 13, 2001.[29]

## II. DISCUSSION

### A. Standard Governing Motions For Summary Judgment

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.PROC. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses which demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof at trial, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must then set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); FED.R.CIV.PROC. 56(e).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). The evidence presented by the parties must be admissible. FED.R.CIV. PROC. 56(e). Conclusory, speculative tes-

---

week of his incarceration, complaining that he was not getting his medicine on time. *Id.* at 55:10–25.

**24.** *Id.* at 57:24–58:2, 59:18–60:16.

**25.** Def.'s Facts, ¶ 7; Pl.'s Facts, ¶¶ 7–8. Plaintiff disputes that the facsimile was the first time that the LASD had notice that plaintiff was entitled to release. He does not dispute, however, that a fax authorizing plaintiff's release, with an attached teletype, was received at this time.

**26.** Defendant's Facts, ¶ 8; Plaintiff's Facts, ¶ 8.

**27.** Def.'s Facts, ¶ 9; Pl.'s Facts, ¶ 9.

**28.** Def.'s Facts, ¶ 10; Pl.'s Facts, ¶ 10.

**29.** Def.'s Facts, ¶ 13; Pl.'s Facts, ¶ 13. Plaintiff disputes that he was released twelve and a half hours after the IRC first received notice that the parole hold had been removed. He does not dispute, however, that he was released approximately twelve and a half hours after the IRC received the July 13, 2001, facsimile.

timony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir.1985); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979).

### B. Plaintiff's Claim Under *Monell v. Department of Social Services*

By suing defendant in his official capacity, plaintiff has asserted claims against Los Angeles County and/or the Los Angeles Sheriff's Department ("LASD").[30] See *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity"); *Brandon v. Holt*, 469 U.S. 464, 471–72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985) ("a judgment against a public serv-ant 'in his official capacity' imposes liability on the entity that he represents"); *Monell, supra,* 436 U.S. at 690, n. 55, 98 S.Ct. 2018 ("official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent"); *Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1188 (9th Cir.2003) ("a suit against a state official in his or her official capacity is not a suit against the official but a suit against the official's office," quoting *Will v. Michigan Department of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)).

The liability of a public entity under *Monell* cannot be premised on a *respondeat superior* theory. See *Monell, supra,* 436 U.S. at 693, 98 S.Ct. 2018. Rather, local governments can be held liable for the actions of their employees only if those employees commit unlawful acts pursuant to a "policy or custom" of the entity. See *id.* at 694, 98 S.Ct. 2018.[31]

**30.** Plaintiff contends that he has also sued defendant in his individual capacity. Plaintiff, however, offers no evidence that might lead a rational trier of fact to conclude that defendant Baca could be liable in his individual capacity. To hold defendant liable in his individual capacity, plaintiff must show that Baca "set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (internal quotation marks and brackets omitted). In *Larez*, for example, plaintiff offered evidence that Los Angeles Police Chief Daryl Gates signed a letter that effectively ratified an investigation found to have been constitutionally deficient. *Id.* Here, by contrast, plaintiff has offered no evidence regarding Baca's personal involvement in the alleged overdetention. The court therefore grants defendant's motion for partial summary judgment on plaintiff's individual capacity claims.

**31.** Because a state is not amenable to suit under § 1983, an official acting pursuant to a policy of the state government cannot be held liable under the statute. See *McMillian v. Monroe County*, 520 U.S. 781, 783, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997); *Will, supra,* 491 U.S. at 71, 109 S.Ct. 2304 ("neither a State nor its officials acting in their official capacities are 'persons' under § 1983"). The Ninth Circuit has held that, in exercising control of the county jail, the Sheriff acts as an official policy-maker for the County of Los Angeles, not for the state of California. See *Streit, supra,* 236 F.3d at 564–65; see also *Cortez v. County of Los Angeles*, 294 F.3d 1186, 1189–91 (9th Cir.2002) (holding that the sheriff acted on behalf of the County in establishing and implementing security procedures for the county jail). The California Court of Appeal has reached a contrary result, concluding that the sheriff is not a "person" under § 1983 because he acts as a state officer in exercising responsibility over the jail. See *County of Los Angeles v. Superior Court*, 68 Cal.App.4th 1166, 1176, 80 Cal.Rptr.2d 860 (1998) ("We conclude that in setting policies concerning release of persons from the Los Angeles County jail, the Los Angeles County Sheriff acts as a state officer performing state law enforcement duties, and not as a policymaker on

To hold a public entity liable under § 1983, plaintiff must first establish that he has been deprived of a constitutional or statutory right. See *Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point"); *Sweaney v. Ada County*, 119 F.3d 1385, 1392 (9th Cir.1997) (" 'the municipal defendants cannot be held liable because no constitutional violation occurred' "); *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir.1994) ("While the liability of municipalities doesn't turn on the liability of individual officers, it is contingent on a violation of constitutional rights").[32] Second, plaintiff must show that the deprivation of his rights was the result of a policy or custom of the public entity. See *Monell, supra*, 436 U.S. at 694, 98 S.Ct. 2018 ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is

behalf of the County of Los Angeles"). The court, however, is bound by the Ninth Circuit's interpretation. See *Benas v. Baca*, No. CV–00–11507 LGB (SHx), 2001 WL 485168, * 9–10 (C.D.Cal. Apr.23, 2001) (following the Ninth Circuit's view on this issue).

**32.** Plaintiff cites *Fairley v. Luman*, 281 F.3d 913 (9th Cir.2002) (per curiam), for the proposition that *Monell* liability need not be predicated on a showing that an individual officer violated a plaintiff's constitutional rights. In *Fairley*, the Ninth Circuit held that the City of Long Beach could be held liable on plaintiff's false arrest and deprivation of liberty without due process of law claims, despite the fact that individuals officers had been found not liable on the false arrest claim. *Id.* at 916–17. The court noted that the constitutional deprivations "were not suffered as a result of actions of the individual officers, but as a result of the collective inaction of the Long Beach Police Department." *Id.* at 917; see also *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1186, n. 7 (9th Cir.2002) ("... in *Fairley v. Luman*, 281 F.3d 913 (9th Cir.2002), we explicitly rejected a municipality's argument that it could not be held liable as a matter of law because the jury had determined that the individual officers had inflicted no constitutional injury"). Plaintiff's citation of *Fairley* appears to misapprehend the basis for the present motion. Defendant does not argue that he is not liable because individual officers did not violate plaintiff's constitutional rights. Rather, defendant asserts that he is not liable because plaintiff was not deprived of his constitutional rights. The proposition that an individual must be deprived of a federal right, or face imminent danger of deprivation, before he or she may sue under § 1983 is unassailable. See *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) ("To state a claim under § 1983, *a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States*, and must show that the alleged deprivation was committed by a person acting under color of state law" (emphasis added)); *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir.2003) ("A § 1983 plaintiff must demonstrate a deprivation of a right secured by the Constitution or laws of the United States..."); *Franklin v. Terr*, 201 F.3d 1098, 1100 (9th Cir.2000) ("To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that (1) he or she was deprived of a right secured by the Constitution or federal law; and (2) the defendant acted 'under color of state authority' in depriving the plaintiff of this right"); *Erdman v. Cochise County*, 926 F.2d 877, 882 (9th Cir.1991) ("In order to establish Erdman's right to trial on his municipal liability claim, the court must first determine that a constitutional violation has occurred ..."); see also 42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, *shall be liable to the party injured* " (emphasis added)).

responsible under § 1983").[33] Defendant concedes, for purposes of this motion, that *if* plaintiff was deprived of a constitutional right, the deprivation was the result of a policy or custom of the LASD. The motion asserts only that plaintiff's constitutional rights were not violated.[34]

## C. Whether Plaintiff's Rights Were Violated

■ "A prisoner's petition for damages for excessive custody can be a legitimate § 1983 claim." *Haygood v. Younger*, 769 F.2d 1350, 1359 (9th Cir.1985) (en banc). Such an action is based on an individual's Fourteenth Amendment "due process right to be released within a reasonable time after the reason for his detention [has] ended." *Brass v. County of Los Angeles*, 328 F.3d 1192, 1200 (9th Cir.2003) (citing *Baker v. McCollan*, 443 U.S. 137,

144–46, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)); see also *Zadvydas v. Davis*, 533 U.S. 678, 690, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) ("freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the due process] clause protects"); *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir.1992) ("Indeed, the paradigmatic liberty interest under the due process clause is freedom from incarceration"); *Lewis v. O'Grady*, 853 F.2d 1366, 1369–70 (7th Cir.1988) (stating that a § 1983 action lies for unreasonable delay between judicial discharge and actual release from custody); *Fowler v. Block*, 2 F.Supp.2d 1268, 1275–76 (C.D.Cal.) (persons have a right not to be detained for an unreasonable period following a clear judicial order of release), rev'd. on other grounds, 185 F.3d 866, 1999 WL 413476 (9th Cir. June 17, 1999).[35]

33. Generally, plaintiffs can demonstrate municipal liability for a constitutional violation in one of three ways. First, they can show that a person or entity with decision-making authority within the municipality expressly enacted or authorized an unconstitutional policy or gave an unconstitutional order. See *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (". . . municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances"); *Monell, supra*, 436 U.S. at 694, 98 S.Ct. 2018 (municipal liability is properly imposed where an unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers"). Second, they can prove that the injury was the result of municipal custom, i.e., a practice "so permanent and settled" as to constitute a "custom or usage" of the municipal defendant. See *id.* at 691, 98 S.Ct. 2018; see also *Pembaur, supra*, 475 U.S. at 481–82, n. 10, 106 S.Ct. 1292. Finally, a local governmental body may be liable if it has a policy of inaction and such inaction amounts to a failure to protect constitutional rights. See *City of Canton v. Harris*, 489 U.S. 378, 388–89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

34. No issue of qualified immunity is raised by this case, because unlike individual officers, local governments are not entitled to qualified immunity. *Owen v. City of Independence*, 445 U.S. 622, 656, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) ("municipalities have no immunity from damages liability flowing from their constitutional violations"); see also *Brandon, supra*, 469 U.S. at 472–73, 105 S.Ct. 873 (holding that qualified immunity was inapplicable in an action against a public official in his official capacity).

35. Defendant seeks partial summary judgment on plaintiff's Fourth Amendment claim because the right allegedly violated is grounded in the Fourteenth Amendment. Plaintiff counters that his claim arises under both the Fourth and Fourteenth Amendments. The Ninth Circuit has stated that "[t]he Fourth Amendment sets the applicable constitutional limitations on the treatment of an arrestee detained without a warrant up until the time such arrestee is released *or found to be legally in custody* based upon probable cause for arrest." *Pierce v. Multnomah County*, 76 F.3d 1032, 1043 (9th Cir.1996) (emphasis added). Here, it is not disputed that plaintiff's arrest was legal *ab initio.* (See Pl.'s Opposition to Defendant Baca's Motion for Summary Judg-

■ Defendant asserts that his motion raises a single issue: can plaintiff raise a triable issue of fact as to whether there was an unreasonable delay between his actual release and the time the reason for his detention ended. Close examination of the evidence and arguments presented by the parties, however, reveals that there are multiple issues to be resolved.

The reason for plaintiff's detention ended sometime in the morning or early afternoon of July 6, 2001, when the presiding officer at his parole revocation hearing found no grounds to revoke parole. Plaintiff was not released, however, until the early morning of July 14, 2001. Defendant does not argue that this seven and a half day delay was reasonable as a matter of law.[36] Rather, he asserts that the LASD did not receive notice that plaintiff was entitled to release until 12:44 p.m. on July 13, 2001. As plaintiff has sued the LASD,

ment or in the Alternative, Summary Adjudication of Issues at 24 (arguing that plaintiff's rights under the Fourth Amendment were not violated until July 6, 2001, well over a month after his arrest); CAL. PEN. CODE § 3056 ("Prisoners on parole shall remain under the legal custody of the department and shall be subject at any time to be taken back within the inclosure of the prison")). Under *Pierce,* therefore, plaintiff's rights under the Fourth Amendment ended upon his initial arrest. See *Brooks v. George County, Mississippi,* 84 F.3d 157, 166 (5th Cir.1996) ("Fourth Amendment claims are appropriate [only] when the complaint contests the method or basis of the arrest and seizure of the person"); see also *Jones v. City of Jackson,* 203 F.3d 875, 880 (5th Cir.2000) ("Jones's Fourth Amendment allegations fail because he admitted that a facially valid bench warrant existed in Hinds County on the date the detainer was sent to Jackson City Jail. The original seizure was therefore pursuant to a valid court order.... The protections offered by the Fourth Amendment do not apply if the plaintiff challenges only continued incarceration"). See generally *Baker, supra,* 443 U.S. at 144–45, 99 S.Ct. 2689 ("Respondent was indeed deprived of his liberty for a period of days, but it was pursuant to a warrant conforming, for purposes of our decision, to the requirements of the Fourth Amendment. Obviously, one in respondent's position could not be detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment.... We may even assume, *arguendo,* that, depending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of 'liberty ... without due process of law' ").

Plaintiff does not appear to dispute this. Citing *Thompson v. City of Los Angeles,* 885 F.2d 1439 (9th Cir.1989), however, he asserts that he was effectively "re-arrested without probable cause by the Jail" when the LASD failed to release him following his parole hearing. *Thompson* does not support this theory of constructive re-arrest. Rather, in *Thompson,* the court held that plaintiff could assert a Fourth Amendment claim because officials failed for five days to bring him before a magistrate for a probable cause hearing. *Id.* at 1444. Because no probable cause hearing was held during this period, plaintiff was not "legally in custody." *Pierce, supra,* 76 F.3d at 1043; see also *County of Riverside v. McLaughlin,* 500 U.S. 44, 46, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) ("In *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 ... (1975), this Court held that the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention following a warrantless arrest"). Plaintiff's claim in the instant case is based on a "due process right to be released within a reasonable time after the reason for his detention [has] ended," not on a Fourth Amendment right against unlawful seizure. *Brass, supra,* 328 F.3d at 1200. Accordingly, the court grants defendant's motion for partial summary judgment on plaintiff's Fourth Amendment claim.

36. Defendant does not necessarily concede, however, that the seven and a half day delay in releasing plaintiff was *unreasonable* as a matter of law. Rather, he appears to concede that an overdetention of this length is sufficient to raise a factual issue regarding the reasonableness of the delay.

and not the Department of Corrections or the Board of Prison Terms,[37] defendant maintains that the reasonableness of the delay must be measured from the time *the LASD* learned that plaintiff was entitled to release. See *Wood v. Worachek*, 618 F.2d 1225, 1231 (7th Cir.1980) ("Generally, a jailer is liable for the illegal detention of an inmate when he unreasonably detains the inmate for arraignment or release, or possesses an affirmative knowledge of the illegality of the arrest. But if the errors upon which liability is asserted take place beyond the scope of his responsibility, he cannot be found liable where he has acted reasonably and in good faith," citing *Bryan v. Jones*, 530 F.2d 1210, 1215 (5th Cir.1976) (a jailer is not liable for an overdetention if "the errors take place outside of his realm of responsibility")).

Plaintiff does not contest this general proposition. Rather, he argues he has presented evidence that defendant was on notice of the release of the parole hold much earlier than July 13, 2003. Accordingly, the court must first determine whether factual issues exist regarding the date defendant first received notice that plaintiff was to be released. It must also examine whether there are any other circumstances that raise triable issues of fact regarding the reasonableness of defendant's conduct or policies. Based on the answers to these questions, the court must then ask whether a rational trier of fact could conclude that there was an unreason-able delay between defendant's receipt of notice and plaintiff's release.

### 1. When Defendant First Received Notice That Plaintiff Was Entitled To Release

Defendant argues that the LASD did not receive notice of the fact that plaintiff was entitled to release until approximately 12:44 p.m., on July 13, 2001, when Marbra received a facsimile incorporating a copy of the July 6, 2001, teletype that authorized plaintiff's release. In support of this argument, he proffers a copy of the facsimile Marbra received, which clearly shows that it was sent on July 13, 2001, at 12:44 p.m. Defendant also cites Marbra's sworn declaration, in which she states that the IRC was not notified that it was to release plaintiff prior to its receipt of the facsimile.[38] Defendant argues that there is no contrary evidence, and thus that it is undisputed that the LASD did not receive notice of plaintiff's entitlement to release until July 13, 2001, at 12:44 p.m. As it is indisputably the Department of Corrections' responsibility to notify IRC, defendant maintains he is entitled to summary judgment.

Plaintiff counters that triable issues of fact remain regarding when IRC, and thus LASD, received notice that plaintiff was to be released. Citing *Kennell v. Gates*, 215 F.3d 825 (8th Cir.2000), plaintiff argues that he is entitled to an evidentiary presumption that the LASD received the original teletype notification of release on July

---

**37.** The Department of Corrections and/or the Board of Prison Terms is responsible for notifying the LASD that detainees are subject to release. Plaintiff cannot sue the Board of Prison Terms or the Department of Corrections as they are arms of the state of California. See *Chamberlin v. California Dep't of Corrections*, 967 F.2d 584, 1992 WL 149589, * 2 (9th Cir. June 30, 1992) (Unpub.Disp.) (the Board of Prison Terms and the Department of Corrections are not subject to suit under the Eleventh Amendment); *Frye v. Board of Prison Terms*, 961 F.2d 216, 1992 WL 84210, * 2 (9th Cir. Apr.24, 1992) (Unpub.Disp.) (Board of Prison Terms is a state agency). Moreover, even were there no Eleventh Amendment bar, plaintiff could not maintain his present claim against these entities because the state is not a person under § 1983. See note 24, *supra*, and cases cited therein.

**38.** Marbra Decl., ¶ 17.

6, 2001, because it was placed on the CLETS system that day. The facts of *Kennell* are instructive. In that case, plaintiff Sharon Kennell was arrested in the mistaken belief that she was her sister, Deborah, for whom an arrest warrant had been issued. *Id.* at 827. When Sharon arrived at the police station, she told the defendant, Officer Diahann Gates, that she was not Deborah Kennell. Gates compared a photograph of Deborah to Sharon, and concluded that Sharon was Deborah. *Id.* Sharon then requested that her fingerprints be taken. Approximately an hour later, she asked Gates about the fingerprint test; Gates falsely told Sharon that her fingerprints matched those of Deborah Kennell. *Id.* Sharon remained in custody for six days, until Deborah's parole officer came to the jail and told jailers that the person they had detained was not Deborah Kennell. *Id.*

In fact, the fingerprint analysis had been negative. The technician who analyzed the fingerprints sent an "in-house computer message to the Warrant Fugitive Section and specifically to the attention of Gates, notifying her that the wrong person was in custody." *Id.* The message was sent the day Gates booked Sharon, but after she had left the jail. *Id.* Messages sent in this manner were usually printed out by one central printer and hand-delivered to the addressees. *Id.* Gates claimed never to have received the message. *Id.* A jury found otherwise. *Id.* at 828.

On appeal, the Eighth Circuit agreed with the district court that "an unreasonable or negligent failure to investigate claims of innocence or mistaken identity of an individual detained pursuant to a facially-valid warrant for a few days does not amount to a constitutional violation." *Id.* at 828 (citing *Baker, supra,* 443 U.S. at 145–46, 99 S.Ct. 2689). It held, however, that if a jury could reasonably conclude that Gates received the message from the fingerprint technician, it could find that she was deliberately indifferent to Sharon's rights. *Id.* at 829.

As in the instant case, therefore, the issue in *Kennell* was whether there was sufficient evidence from which a rational jury could find that Gates had *received* the message. The court held there was, because "[a] jury is generally permitted to infer that information sent via a reliable means—such as the postal service or a telegram—was received." *Id.* at 829. The court found the fact that the message was sent via more modern electronic means immaterial, stating: "We see no principled reason why a jury would not be able to make the same inference regarding other forms of communication—such as facsimiles, electronic mail, and in-house computer message systems—*provided that* they are accepted as generally reliable *and* that the message is properly dispatched." *Id.* (emphasis added).

The analysis in *Kennell* is persuasive. Plaintiff has not adduced the same type of evidence as did the plaintiff in *Kennell,* however, such that he is entitled to invoke the presumption in this case. In *Kennell,* plaintiff offered evidence detailing precisely how the fingerprint analyst's message reached Gates. Here, by contrast, plaintiff proffers no specific evidence indicating how the message from the Department of Corrections would have reached LASD or the county jail.[39] He merely points to the

---

**39.** Plaintiff argues that the teletype was sent over the CLETS system, but provides no information as to how the teletype portion of that system works. In support of his argument that there is a presumption defendant received the release order via CLETS, plaintiff cites the Minjarez and Hernandez deposi-

tions. (See Pl.s' Facts, ¶ 7.) Minjarez testified that the Department of Corrections is "supposed to send [the teletype] to whoever they need to send it to for the inmate to be released." (Minjarez Depo. at 48:4–5.) This does not explain how the teletype was sent to the LASD, however, or how a teletype is re-

teletype sent to the LASD on July 6, 2001, and argues that, in the absence of contrary evidence, the court must assume it was received.

■ In response to this argument, defendant proffered with his reply evidence regarding the manner in which CLETS teletype systems operates. Sandra Engelbart, an experienced clerk at the LASD, who has dealt with teletypes similar to the one here at issue,[40] submitted a declaration stating that each law enforcement agency

in California is assigned an Originating Agency Identifier Number ("ORI").[41] When a teletype is sent to a law enforcement agency, it is addressed to the ORI for that agency.[42] The July 6, 2001, teletype was addressed to "LACJ." [43] Engelbart asserts there is no ORI for "LACJ," for any division within the LASD, or for any division of any California law enforcement agency.[44] As a consequence, she states, the message could not have been received by the LASD.

ceived by the LASD. While Minjarez is an employee of the Department of Corrections, he does not work in the teletype office and has no firsthand knowledge of its procedures. Moreover, he is not employed by the LASD, and there is no evidence that he has any special knowledge of LASD practices. Plaintiff's counsel, in fact, specifically noted this during Minjarez's deposition—"This witness [Minjarez] doesn't have personal knowledge of the [practices of the LASD]." (*Id.* at 66:2–6.) Hernandez, too, is not an employee of the LASD, but of the Department of Corrections. Initially, she testified that she believed the teletype was sent to the county jail, but that she had "no clue" how it got there. (Hernandez Depo. at 14:22–15:15.) Later, she stated that teletypes were "sent [to the jail] on CLETS." (*Id.* at 16:9–17:20.) CLETS was created pursuant to California Government Code §§ 15150 et seq. See generally *Martinez, supra,* 22 Cal.4th at 120–30, 91 Cal. Rptr.2d 687, 990 P.2d 563 (discussing the history of and statutory authority for CLETS); *People v. Dunlap,* 18 Cal.App.4th 1468, 1476–81, 23 Cal.Rptr.2d 204 (1993); 82 Ops. Cal. Atty. Gen. 47 (1999). CLETS is maintained by the Department of Justice, but police departments, district attorneys, and other law enforcement agencies routinely report information to CLETS, which is input to a statewide database accessible to law enforcement agencies. *Martinez, supra,* 22 Cal.4th at 120–21, 91 Cal.Rptr.2d 687, 990 P.2d 563; see also *id.* at 141 (Werdegar, J., dissenting) (describing CLETS as a "repository" of information); *Dunlap, supra,* 18 Cal.App.4th at 1471–72, 23 Cal.Rptr.2d 204 (describing a "CLETS data base response" to information about certain defendants). From the evidence adduced in this case, it appears that CLETS also permits law enforcement agencies to communi-

cate with one another via teletype. As noted, however, there is no evidence in the record regarding how these teletypes are sent by the Department of Corrections, nor how they are received by the LASD. Additionally, there is no evidence regarding how teletypes received by the LASD are transmitted or delivered to the IRC at the jail.

**40.** Engelbart Decl., ¶¶ 1–2. The Engelbart declaration was not timely filed under Local Rule 7–10. The court, however, has broad discretion in the application of the local rules. See, e.g., *Miranda v. Southern Pac. Transp. Co.,* 710 F.2d 516, 521 (9th Cir.1983); *United States v. Warren,* 601 F.2d 471, 473–74 (9th Cir.1979) ("Only in rare cases will we question the exercise of discretion in connection with the application of local rules"). Because there is no indication that plaintiff was prejudiced by the one-day late filing, the court exercises its discretion to consider the declaration. See *Marshall v. Gates,* 44 F.3d 722, 725–26 (9th Cir.1995) (reversing the district court for failure to consider late-filed affidavits because the sanction of failing to consider them was too prejudicial to a civil rights plaintiff); *Luke v. Abbott,* No. SA CV 96–176–GLT[RC], 1996 U.S. Dist. LEXIS 20890, * 7 (C.D.Cal.1996) (denying a motion to strike based on "the timeliness of the filing" because "the moving party has not shown any prejudice from the late filing").

**41.** Engelbart Decl., ¶ 3.

**42.** *Id.,* ¶ 4.

**43.** Pl.'s Ex. 6.

**44.** Engelbart Decl., ¶ 4.

At the hearing on the instant motion, plaintiff represented that he had never had a chance to depose Engelpart, because she was not disclosed pursuant to Rule 26 of the Federal Rules of Civil Procedure. The court granted plaintiff leave to depose Engelbart, and to file a sur-reply addressing the Engelbart declaration and whether the July 6, 2001, teletype was properly dispatched.[45] In his sur-reply, plaintiff proffered evidence that Englebart did not work as a teletype operator at the time the July 6, 2001, message was dispatched.[46] Rather, Engelbart did not begin working at the Men's Central Jail until June 2002,[47] and then dealt only with *intra*-agency teletypes, not *inter*-agency teletypes like the one here at issue.[48] As a result, plaintiff argues that Engelbart is not competent to testify regarding the codes used on interagency teletypes as of July 2001.

The fact that Engelbart did not work as a teletype operator at the time the teletype in question was sent does not render her incompetent to testify. Rather, it affects and the weight and credibility of her testimony. See *Kaczmarek v. Allied Chemical Corp.*, 836 F.2d 1055, 1060 (7th Cir.1987) ("Kaczmarek complains that the conclusion that he must have attended the meetings went beyond Daubs' personal knowledge and was therefore inadmissible under Rule 602. We disagree. In testifying that the meetings were held and that all drivers were required to attend them, Daubs was testifying to matters within his personal knowledge. And if Kaczmarek was required to attend the meetings it is a fair though not compelling inference that he did attend them"); *E.E.O.C. v. Catholic Knights Ins. Soc.*, 915 F.Supp. 25, 27 (N.D.Ill.1996) ("Sheedy's testimony is admissible because he held a position in which he would be expected to know the amount of control Catholic Knights exhibited over the insurance agents. That Sheedy was fired and that Sheedy did not occupy the position for almost a year before the relevant time are factors that go to the weight of the evidence, not its sufficiency"); *Washington Central Railroad Co., Inc. v. National Mediation Board*, 830 F.Supp. 1343, 1353 (E.D.Wash.1993) ("Personal knowledge, however, is not strictly limited to activities in which the declarant has personally participated. As a case which plaintiff cites clearly demonstrates, personal knowledge can come from review of the contents of files and records").

Moreover, the fact that Engelbart did not work with *inter*-agency teletypes does not necessarily mean that she is not knowledgeable about the agency codes used on such teletypes. See *In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir.2000) ("Griesbach's five-year tenure as Arrow's credit manager lends support to his claim of 'personal knowledge' of industry practice");

---

**45.** While the Engelbart declaration was proper rebuttal, it was incumbent upon the court to afford plaintiff an opportunity to respond to defendant's new evidence. See *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir.1996) ("We agree with the Seventh Circuit, which held that '[w]here new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the [non-]movant an opportunity to respond,'" citing *Black v. TIC Inv. Corp.*, 900 F.2d 112, 116 (7th Cir.1990)), *cert. denied*, 522 U.S. 808, 118 S.Ct. 48, 139 L.Ed.2d 14 (1997); see also *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1041 (9th Cir.2003) (citing *Provenz* for the proposition that a "district court may consider new evidence presented in a reply brief if the district court gives the adverse party an opportunity to respond").

**46.** Plaintiff's Sur Reply on Defendant Baca's Motion for Summary Judgment or, in the Alternative, Summary Adjudication of Issues, Ex. 4 (Deposition of Sandra Engelbart ("Engelbart Depo.")) at 15–18.

**47.** *Id.* at 18:3–19:23.

**48.** *Id.* at 27:15–28:18.

*Barthelemy v. Air Line Pilots Ass'n.*, 897 F.2d 999, 1018 (9th Cir.1990) (a CEO's personal knowledge of various corporate activities could be presumed). Nonetheless, the timing and nature of Engelbart's work for the LASD raises sufficient credibility questions that a jury must resolve when defendant received the teletype regarding plaintiff's release. See *Lindahl v. Air France*, 930 F.2d 1434, 1438–39 (9th Cir.1991) (evidence calling into question the credibility of defendant's explanations was sufficient to raise a genuine issue of material fact defeating summary judgment); 10A Charles Alan Wright, Arthur Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE, Civ.3d § 2726 (3d ed. 2003) ("Clearly, if the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and the case allowed to proceed to trial"). cf. *Frederick S. Wyle Professional Corp. v. Texaco, Inc.*, 764 F.2d 604, 608 (9th Cir.1985) ("Neither a desire to cross-examine affiant nor an unspecified hope of undermining his or her credibility suffices to avert summary judgment, unless other evidence about an affiant's credibility raises a genuine issue of material fact"). Because triable issues of fact remain as to when defendant first received notice that plaintiff was to be released, defendant's motion for summary judgment must be denied.

**2. Whether Other Facts Raise Triable Issues Regarding The Reasonableness Of Defendant's Conduct Or Policies**

■ As noted earlier, plaintiff's lawsuit challenges defendant's customs and policies regarding the release of persons held in the county jail. Defendant has not provided discovery to plaintiff as yet concerning those policies and practices; indeed, it argued that it should not be required to do so until this motion was heard and decided.

This position is based on defendant's view that whether plaintiff has suffered a constitutional violation, and whether that violation was caused by an unconstitutional policy, are separate and distinct issues. The court is not convinced that the *Monell* inquiry is so simple. In fact, the primary case on which defendant relies—*Brass v. County of Los Angeles*, 328 F.3d 1192 (9th Cir.2003)—belies defendant's argument. In *Brass*, appellant claimed that he had been injured by defendant's unconstitutional policy of processing court-ordered releases after it processed other releases. *Id.* at 1200. The Ninth Circuit did not, as defendant maintains, find that the delay in plaintiff's release of 39 hours was reasonable as a matter of law. *Id.* at 1201. Rather, it rejected such a rigid approach, and held that defendant's *policy* of processing court-ordered releases last was not unconstitutional. *Id.* ("It is virtually impossible to establish an absolute minimum time to meet all potential circumstances which might exist," quoting *Lewis, supra*, 853 F.2d at 1370).

Also instructive is *Fairley, supra*, 281 F.3d 913. In *Fairley*, John Fairley was arrested on a valid warrant for his twin, Joe Fairley. *Id.* at 915. John repeatedly complained that he was not the person whom the police sought; his protests were ignored, however, until he filed a "citizen's complaint from jail." *Id.* In all, Fairley was held for twelve days. *Id.* A jury found that this twelve-day confinement resulted from the city's failure to implement procedures for checking to ensure that persons detained on warrants were the individuals named in such warrants. *Id.* at 918. The Ninth Circuit held that Fairly "had a liberty interest in being free from a twelve-day incarceration without any procedural safeguard in place to verify the warrant he was detained on was his." *Id.*

Here, plaintiff alleges that he had a liberty interest in not being detained for

seven and a half days without adequate procedures in place to ensure that he was released once the reason for his confinement had ended. Defendant argues that plaintiff's confinement was not the result of a deliberately indifferent county custom or policy, but of the Department of Corrections' failure to notify it that plaintiff should be released. This may be correct. Plaintiff argues, however, that defendant has a policy of being deliberately indifferent to the rights of persons who are entitled to release, and asserts that his release was delayed *because of this policy.* Given that no discovery has occurred regarding defendant's policies, and thus that there is no evidence regarding them, it is impossible to resolve this issue on the current record. This is particularly true since plaintiff has adduced evidence that raises triable issues of fact regarding the as yet undisclosed policies.

Specifically, plaintiff argues that defendant was on notice that he was entitled to be released before July 13, 2001, because he told sheriff's deputies on two occasions that the parole hold had been removed at the conclusion of his parole hearing and that he should be released. The issue is whether a jury could find that this imposed a duty on the LASD to investigate plaintiff's claim, and that the failure to perform the duty constituted "deliberate indifference" to plaintiff's rights. See *Daniels v. Williams,* 474 U.S. 327, 330–32, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (to recover under § 1983 action for violation of due process, plaintiffs must show more than negligence; they must show a higher level of culpability such as, *inter alia,* "deliberate indifference"); *Kennell, supra,* 215 F.3d at 829 ("Even assuming that Gates's failure to investigate Sharon's mistaken identity claim further or to inquire about the results of the fingerprint analysis was unreasonable or negligent, those actions cannot amount to a constitutional

violation for this six-day confinement" because plaintiff must show deliberate indifference); *Gray v. Cuyahoga County Sheriff's Department,* 150 F.3d 579, 583 (6th Cir.1998) ("the principal question for the trier of fact will be whether Fuerst and/or Ussery acted with something akin to deliberate indifference in failing to ascertain that the Dwayne Gray they had in custody was not· the person wanted by the Michigan authorities on the outstanding parole-violation warrant").

Plaintiff alleges that the lack of response to his complaints does evidence deliberate indifference, and courts have held that repeated complaints by an inmate regarding his right to be released can raise a triable issue of fact regarding the deputies' deliberate indifference. See *Armstrong v. Squadrito,* 152 F.3d 564, 568, 580 (7th Cir.1998) (holding that plaintiff's "daily complaints" over a period of more than forty days, and the four to five "inmate request forms" he completed but his guards would not accept, constituted "repeated and increasingly strenuous complaints [that] should have provided the guards with sufficient knowledge to suspect improper confinement and take additional action," and gave rise to "an inference that the guards knew of a serious risk. For the guards to have continued to refuse Armstrong's complaints and for them to have continued only to check the will call list evince[d] the serious possibility of deliberate indifference to Armstrong's plight," and justified denial of defendants' motion for summary judgment); see also *Johnson v. Herman,* 132 F.Supp.2d 1130, 1140–41 (N.D.Ind.2001) (holding that triable issues of fact regarding deliberate indifference precluded summary judgment where plaintiff completed seven "inmate request forms" over a period of ten days, an officer called the court eighteen days after plaintiff was first incarcerated, but received incorrect information from an unknown judicial staff person,

and plaintiff remained incarcerated for an additional eight days, during which he submitted seven additional complaint forms).

Plaintiff offers no evidence, however, that the deputies knew there was a substantial risk he was being wrongfully detained, and knowingly failed to investigate. Moreover, the fact that only two complaints were made is not sufficient to raise a triable issue of fact regarding their deliberate indifference. See *Armstrong, supra,* 152 F.3d at 580 (holding that it was the repeated nature of plaintiff's complaints that raised a triable issue of fact regarding deliberate indifference, the court noted: "The district court might have it right [in granting summary judgment], however, if Armstrong had protested only once or twice. In such circumstances, the guards' efforts in checking the will call list might absolve them of their refusal to accept Armstrong's written complaints"); see generally *L.W. v. Grubbs,* 92 F.3d 894, 900 (9th Cir.1996) ("deliberate indifference" requires a showing that defendants knew, or were "willfully blind," to obvious danger, yet purposefully failed to take steps to address it); *Wallis v. Baldwin,* 70 F.3d 1074, 1077 (9th Cir.1995) (to prove deliberate indifference, plaintiff must show that an official "knows of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," and that he "also [drew] the inference," quoting *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Redman v. County of San Diego,* 896 F.2d 362, 366 (9th Cir.1990) (deliberate indifference does not require that officials know to a "moral certainty" that harm will occur; rather, they must know that there is a substantial likelihood of harm).

Plaintiff contends he did more than offer verbal protests, however. He asserts that he completed a formal grievance form the day after his parole hearing, complaining that he should be released. Plaintiff proffers no copy of the form; viewing the evidence in the light most favorable to him, however, the court must assume one was filed. Coupled with his verbal protests, the filing of this grievance raises triable issues of fact regarding deliberate indifference. See *McCurry v. Moore,* 242 F.Supp.2d 1167, 1180–81 (N.D.Fla.2002) (holding that triable issues of fact precluded summary judgment where an inmate submitted an informal grievance that may have attached copies of the information on which he was incarcerated and alerted jailers to the fact that his period of custody began earlier than their records showed, and thus might support a jury finding of deliberate indifference to the fact that plaintiff was entitled to gaintime credits). Had deputies taken action on plaintiff's grievance, they might have accessed the CLETS system, and seen the Department of Corrections' release of the parole hold recorded there. Follow-up would have confirmed that plaintiff was to be released.

More pertinent to plaintiff's *Monell* claim, there is no evidence in the record regarding defendant's policy for handling the type of grievance plaintiff filed. Stated otherwise, there is no evidence as to what, if anything, the deputies were required to do with a grievance such as plaintiff's, what process, if any, existed for investigating the facts asserted in the grievance, or how long any such process should have taken. Absent such evidence, the court cannot determine whether defendant's policy (or lack of policy) demonstrates deliberate indifference to the rights of overdetained persons such as plaintiff. Triable issues of fact, therefore, remain regarding the reasonableness of defendant's policies.

**3. Whether A Rational Trier Of Fact Could Find The Delay Unreasonable**

█ Given the triable issues of fact that remain as to whether defendant had un-

constitutional policies or customs, or an unconstitutional lack of policies, that precluded deputies from discovering that plaintiff was entitled to release prior to July 13, 2001, there are also triable issues of fact as to whether defendant's delay in releasing plaintiff was reasonable.

The court notes, moreover, that even were it to accept defendant's assertion that the LASD had no way of knowing about the release order until July 13, 2001, at 12:44 p.m., it would still be required to deny the motion for summary judgment. As noted above, the Ninth Circuit's decision in *Brass* does not hold that a 39 hour delay between issuance of a release order and actual release is reasonable as a matter of law. In fact, the court in *Brass* faulted the district court for relying on a rule that 48 hours was reasonable as a matter of law:

> "It is unclear, however, whether the 48–hour period applied to probable cause determinations is appropriate for effectuating the release of prisoners whose basis for confinement has ended. One might conclude that when a court orders a prisoner released—or when, for example, a prisoner's sentence has been completed—the outer bounds for releasing the prisoner should be less than 48 hours. We need not determine that question here, however, since we have concluded that *in the circumstances of this case,* the 39–hour delay in releasing Brass was reasonable and did not violate his constitutional rights." *Brass, supra,* 328 F.3d at 1202 (emphasis added).

As this passage demonstrates, the Ninth Circuit limited its holding to "the circumstances of the case," and did not adopt a *per se* rule that a 39 hour delay was reasonable as a matter of law. *Id.* For the reasons stated in *Brass,* the court similarly cannot adopt a *per se* rule that a twelve and a half hour delay was reasonable as a matter of law.

Rather, the court must, as the Ninth Circuit instructed in *Brass,* look to the "circumstances of the case." *Id.* Here, beyond defendant's general allegations that the LASD needs time to complete certain administrative steps, and, more importantly, to check for wants and holds, defendants offer nothing justifying why it took twelve and a half hours to release plaintiff. Defendant does not attempt to explain why the allegedly necessary administrative steps took twelve and a half hours to complete. Thus, the court can neither find that twelve and a half hours was reasonable or that it was unreasonable. Certainly, it cannot determine reasonableness as a matter of law when defendant has offered only a general assertion that certain steps must be completed prior to release, and provided no explanation as to why those steps are necessary or why they take a particular period of time to complete. See *Gramenos v. Jewel Companies, Inc.,* 797 F.2d 432, 436–37 (7th Cir.1986) ("Gramenos ... seeks compensation for what he says is excessive detention.... [T]he police respond to it only by pointing out that they need to do a lot of things after an arrest—take fingerprints and mug shots, check for outstanding warrants, fill out countless forms. One difficulty is that none of the evidence in this case quantifies the amount of time it would take reasonably diligent officers to complete these tasks.... It is premature to say how long is too long.... On remand *the police should explain* what must be done after an arrest for shoplifting and *why reasonably diligent officers need more than four hours to do it* " (emphasis added)).

Other courts have found that similar unexplained delays raise issues of fact defeating summary judgment. In *Lewis, supra,* 853 F.2d 1366, a person was mistakenly arrested pursuant to an arrest warrant.

*Id.* at 1366. After a magistrate determined that plaintiff was not the person named in the warrant, it took the sheriff eleven hours to release him. *Id.* at 1368–70. Like defendant here, the sheriff argued that the need to complete essential administrative procedures rendered the eleven-hour detention following issuance of the release order reasonable as a matter of law. The court stated:

> "Here, the defendant explained that Lewis was detained because the first … bus returning to the jail left before his identity was verified and he had to wait five hours for the next available bus. Additionally, the sheriff claims that it 'takes some time to sort out' the approximate 600–800 prisoners who are returned from court each day because the … [jail] covers fifty-two acres and consists of several buildings. We recognize that the administrative tasks incident to a release of a prisoner from custody may require some time to accomplish—in this case perhaps a number of hours. Reasonable time must be allowed for such matters as transportation, identity verification, and processing. It is virtually impossible to establish an absolute minimum time to meet all potential circumstances which might exist. What is a reasonable time for detaining a prisoner in custody is a question best left open for juries to answer based on the facts presented in each case. In the instant case, a reasonable jury could find that the 'administrative' delay in Lewis' release was unreasonable. Consequently, the district court's order granting a directed verdict was improper. It is for a jury to determine whether the 11 hours it took the sheriff to discharge Lewis was reasonable. Since the jury did not have an opportunity to consider this is-

sue, the case must be remanded." *Id.* at 1370 (brackets in the original).

Here, the delay in releasing plaintiff after the IRC received a faxed copy of the teletype authorizing plaintiff's removal was slightly longer than that at issue in *Lewis*. Defendant, moreover, relies exclusively on a general reference to administrative necessity to justify the delay, just as the defendant in *Lewis* did. As a consequence, and putting aside the triable issues of fact that remain as to whether unconstitutional policies or lack of policies precluded defendant's earlier discovery of plaintiff's entitlement to release, the court cannot find that the twelve and a half hour delay on July 13 and 14, 2001, was reasonable as a matter of law.[49]

## III. CONCLUSION

For the reasons stated, the court grants defendant's motion for partial summary judgment on plaintiff's claims against him in his individual capacity. The court grants defendant's motion for partial summary judgment on any Fourth Amendment claim stated by plaintiff. The court denies defendant's motion for summary judgment on plaintiff's claim of excessive detention in violation of the Fourteenth Amendment.

---

**49.** If anything, the defendant in *Lewis* had a more compelling explanation—i.e., that no bus was available for several hours to take plaintiff from the courthouse to the jail for processing. *Lewis, supra,* 853 F.2d at 1368. Here, by contrast, plaintiff was sitting in his cell in the county jail.