Plaintiff James R. Sadie, appeals from a summary judgment granted in favor of the defendants in this action to recover damages for fraud and conversion. We affirm.
James Sadie filed a complaint in the Circuit Court of Montgomery County, naming as defendants Donald M. Martin, Martin Realty and Construction Company (Martin Company), Solomon Page, Carmichael and Carmichael (a partnership consisting of Ann Carmichael and Bernard Carmichael), and C and C Land Corporation, Inc. (C C).[1] Sadie alleged that the individual defendants, Ann Carmichael, Bernard Carmichael, Martin, and Page, and the corporate defendants, Martin Company and C C, acting through Martin as agent of each corporation, defrauded him, converted funds belonging to him, and conspired to defraud and convert funds belonging to him. All defendants were granted a summary judgment, and Sadie appeals.
In 1980, Sadie, Page, and Martin formed a partnership for the purpose of purchasing and restoring certain fire damaged commercial property located in Montgomery, Alabama. They discussed at that time the possibility of converting the property into office condominiums. Martin negotiated the financing and purchase of the property, and Page handled the repair and restoration. Sadie's contribution to the partnership was his discovery of the property.
Martin received financing from First Southern Federal Savings and Loan Association of Mobile (First Southern). However, as a prerequisite for making a loan, First Southern required an appraisal of the property by an appraiser selected from its designated panel of appraisers. Martin chose Ann Carmichael from that panel and retained her to make the appraisal. On July 22, 1980, she appraised it as having a fair market value of $148,000.00. Based upon that appraisal, First Southern loaned the partnership $100,000.00, and the partners executed a note and mortgage to First *Page 164 
Southern. The partners incurred no out-of-pocket expense in the purchase. The loan was to be repaid from future income generated by the property.
The actual purchase price of the property was $55,000.00. After closing, the excess loan proceeds were deposited by Martin into either the Martin Company or C C accounts and used to pay expenses, including the costs of repair. Sadie claims that Martin represented to him that the repairs would cost between $15,000.00 and $18,000.00. Martin denies making any representations of that nature. The partnership's accountant showed actual partnership expenditures on the property, including the cost of purchase and repair, as $100,808.94. Sadie requested and received the documentation detailing those expenditures.
Upon completion of the repairs, the property was rented. It was never converted into office condominiums as had been originally discussed.
In the spring of 1983, Sadie requested that Martin and Page purchase his interest in the partnership. Martin agreed, but instructed him to secure another appraisal of the property, whereupon he and Page would purchase his interest for an amount based upon that appraisal. Sadie did not secure an appraisal. Martin suggested that Bernard Carmichael reappraise the property for him, and Sadie made no objection.
Prior to the commencement of that appraisal, the First Southern loan came up for renewal, and First Southern requested a reappraisal of the property. Consequently, Martin hired O.G. Pinkston to conduct that appraisal. Pinkston's appraisal, dated May 11, 1983, valued the property at $125,000.00. First Southern refused, however, to accept it, because Pinkston was not a member of its approved panel of appraisers. Martin retained Bernard Carmichael to reappraise the property for First Southern. His appraisal, dated June 10, 1983, valued the property at $120,000.00. Martin and Page subsequently offered Sadie $12,000.00 for his interest in the partnership based upon Bernard Carmichael's June 10th appraisal. Bernard Carmichael addressed the difference between the valuation in his 1983 appraisal and Ann Carmichael's 1980 appraisal in a letter to Sadie, dated June 27, 1983, where in substance he stated that the respective appraisals were some three years apart and that market conditions had substantially changed during that period of time. Sadie refused to accept this explanation, insisting that his partnership interest was worth far more than what Martin and Page had offered. Martin and Page declined, however, to pay Sadie more than the previously offered $12,000.00 for his interest, and this lawsuit followed.
Sadie contends that Ann Carmichael intentionally misrepresented the true market value of the property in 1980 by appraising it at a value in excess of its true fair market value to enable Martin and Page to secure an inflated loan from First Southern. He argues that he relied upon that appraisal and became liable on the note. In the alternative, he contends that Bernard Carmichael intentionally misrepresented the true market value of the property in 1983 by appraising it at a value below its true fair market value at that time to enable Martin and Page to purchase his partnership interest for less than its actual value. Sadie also contends that Martin, Page, Martin Company, and C C, acting through Martin as agent, converted partnership funds to their own use, and that Martin and Page intentionally misrepresented to him the amount of money to be spent on the repairs and misled him with respect to the conversion of the property into office condominiums. He argues that he relied upon those representations and entered into the partnership. He finally contends that all of the defendants conspired to defraud him.
The defendants insist that there is no evidence supporting Sadie's allegations and that the undisputed facts in this case establish that the transactions between themselves and Sadie were at arm's length and commercially reasonable. Therefore, they *Page 165 
argue, summary judgment was properly granted in their favor. We agree.
Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56 (c), A.R.Civ.P. All reasonable doubts concerning the existence of a genuine issue of fact must be resolved against the moving party. Fountain v. Phillips,404 So.2d 614 (Ala. 1981).
To constitute a conversion of property, there must be a wrongful taking or a wrongful detention or interference, or an illegal assumption of ownership, or an illegal use or misuse. The gist of the action is the wrongful exercise of dominion over property in exclusion or defiance of a plaintiff's rights, where the plaintiff has a general or special title to the property or the immediate right to possession. Ott v. Fox,362 So.2d 836 (Ala. 1978).
The species of fraud alleged by Sadie requires a misrepresentation of material fact made with the intent to deceive and relied upon by, and resulting in damages to, the injured party. Holcombe v. Whitaker, 294 Ala. 430,318 So.2d 289 (1975).
A civil conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means. The gist of the action is not the conspiracy alleged, but the wrong committed. O'Dell v. State, 270 Ala. 236, 117 So.2d 164 (1960).
We have examined and considered all of the evidence in this case and all reasonable inferences to be drawn from it in a light most favorable to Sadie. Neither the evidence nor any reasonable inference arising from it furnishes a scintilla in support of Sadie's allegations. Sadie's undisputed testimony on deposition is as follows:
 "Q. Mr. Sadie, I show you a document that's been previously furnished to your attorney, and I assume you've had an opportunity to see it. Now, it's marked as Defendant's Exhibit Number 2, and it is a recapitulation of the repairs and expenses done in connection with the Martin-Sadie-Page property on Rhodes Street as prepared by Bern, Butler, Capilouto, CPAs.
"A. I've seen it.
 "Q. What does it show in the way of expenditures for the acquisition of the property as well as the repairs made to the property?
"A. $100,808.
 "Q. Do you have any evidence of any kind that would suggest that this figure is incorrect that you just referred to?
"A. Yes.
"Q. Tell me what.
 "A. Mr. Martin telling me it costs fifteen to eighteen thousand.
 "Q. Other than Mr. Martin telling you it would cost fifteen to eighteen thousand dollars to repair the property, do you have any information that would suggest this figure is incorrect?
"A. I don't think so.
 "Q. I'm going to ask you to look at Count Number 17. If you would, read that count to me, please, Mr. Sadie.
 "A. Defendants Martin and Page bought the said property and building for 55,000, made improvements on said property for 15,000, and converted the remaining 30,000 to the use of Defendants Martin and Page and Martin Company.
 "Q. Is that a true allegation or an incorrect allegation?
"A. I feel it's a true one.
 "Q. What do you base the $30,000 conversion to Martin and Page upon?
 "A. I base that on the difference of Mr. Martin stating it would cost fifteen to eighteen thousand at the most to repair, and the statement that they — excuse me one second. The difference of those figures and 100,000 is 30,000.
 "Q. You don't take into consideration what the CPA has actually shown as being expended on the property, 100,808?
"A. No, sir.
 "Q. You're basing this allegation on the conversion to Martin and Page solely and strictly on Mr. Martin's representation to *Page 166 
you that only fifteen to eighteen thousand dollars would be spent on repairs?
"A. That's correct.
 "Q. That's your entire allegation on the conversion; is that correct?
"A. That's the impression that I was under."
Assuming that Martin incorrectly represented to Sadie that the repairs would not exceed $18,000.00, there is no evidence that he intended to deceive him in this respect. It is undisputed that $55,000.00 of the loan proceeds was spent to purchase the property and that later $45,808.94 was spent to repair it and pay other expenses associated with its purchase. Thus, expenditures on the property, $100,808.94, actually exceeded the loan amount. Sadie's testimony on deposition continues:
 "Q. How did these defendants conspire against you to your damage?
 "A. I feel that Mr. Martin got a sweetheart appraisal.
 "Q. A sweetheart appraisal? What is a sweetheart appraisal?
 "A. I think that he — it was a term used by an attorney that gave it to me that said that if you know people in the business you can get them to give you a sweetheart appraisal in your favor where you can borrow more money on it.
 "Q. Is your testimony then that Mr. Martin did get a sweetheart. appraisal?
 "A. I feel like he got an appraisal. One of the appraisals has got to be wrong, I think.
"Q. One of which appraisals?
"A. Either the one that Mr. or Mrs. Carmichael made.
 "Q. The one in '80 and the one in '83, is that what you're saying, that one of them has got to be wrong?
"A. Yes.
 "Q. What did Mr. Martin have to do with the rendering of what you consider a wrong appraisal?
"A. To borrow a larger sum of money at the bank.
 "Q. When did he borrow a larger sum of money at the bank than the appraisal?
 "A. To purchase property, if a person wants to get more money than the value of the land —
". . .
 "A. If he wants more money than what the value of the property is worth, he makes the property higher. It's my understanding that they get 80 percent, as high as 80 percent on appraised values. So if he was wanting to borrow 180,000 or if he wanted to borrow 100,000 he'd try to get considerably more than 100,000 to show that it was a real good loan, I guess, would be the terms used, I imagine.
 "Q. Are you saying then that Mr. Martin told Mr. Carmichael to give him an incorrect appraisal?
 "A. No. I'm saying that Mr. Martin may have told Mr. Carmichael —
 "Q. Not may have told him. I'm asking you what you understand Mr. Martin told —
 "A. I don't know what he told him. I'm going to say that in my feelings he mentioned to Mr. Carmichael, I would like to have a real good appraisal or a very high appraisal, as much as possible, on this property.
 "Q. . . . Is it a fair statement that you have no facts to support your charge that before July 22, 1980, Ann Carmichael agreed to render an appraisal in excess of the true value of the property?
"A. I'd say no.
 "Q. By no you mean that you agree that you have no facts to support that charge?
 "A. I've heard Mr. Martin say that they were very good friends of his, but that's no — I'd say no to the answer. I'd say no to the answer.
"Q. Your answer is no, is that —
"A. Yes. I think that would be the right answer.
". . .
 "Q. . . . Tell me what facts you know that support your claim that in 1980 or at anytime after either one of the Carmichaels agreed that they would, in June *Page 167 
of '83, render a wrong appraisal, purposely undervaluing the property.
"A. I have no facts for that."
The undisputed facts in this case show that the transactions between these parties were at arm's length and commercially reasonable. The difference between Ann Carmichael's 1980 and Bernard Carmichael's 1983 appraisals was explained by Bernard Carmichael in his June 27th letter to Sadie. Sadie's only basis for disputing the content of that letter or the correctness of either of the appraisals is his personal opinion that one of them has to be wrong. Again, Sadie's testimony on deposition:
"A. . . . One of them has to be wrong.
"Q. In your opinion?
"A. In the opinion of many people and myself.
 "Q. What other opinions have you obtained other than yourself?
 "A. Only speaking with some real estate people who have told me that the value of property will very seldom ever decrease, especially in an area where there is added construction going on.
 "Q. In your conversation with these real estate people, did they physically go out and look at the Rhodes Street property?
"A. No, they did not.
 "Q. To your knowledge, have any of them looked at the Rhodes Street property before they rendered an opinion that the property couldn't go down in value?
"A. No, they did not.
 "Q. How do you know the property increased in value, Mr. Sadie?
 "A. Well, I would have to say that I am under the impression personally that when you — okay.
". . .
 "A. If the property is worth 150,000 four years ago and there's a two or three million dollar project going on just four or five blocks away, I felt just by general conversation and listening to real estate people that the properties are all going up in the city. I felt that our property was going up, also.
 "Q. That was your own personal opinion; is that not correct?
 "A. Well, it was my own personal opinion, but now I can say that I did speak with a couple real estate people and they said the same thing.
". . .
 "Q. Well, did you employ anyone to have an appraisal made of your property on Rhodes Street?
"A. No, I did not.
 "Q. Did you ask anybody to go out and look at the property on Rhodes Street?
"A. No, I did not.
 "Q. Have you ever asked anybody to look at it and render to you what they determined to be a fair market value of that property as of April 1, 1983?
"A. No, I did not.
 "Q. Or since? Have you asked anybody to go out there and look at it since?
"A. No. Did not."
Sadie's personal opinions and beliefs concerning the correctness of the two appraisals or the conduct of the defendants do not raise a genuine issue of material fact. Rule 56 (e), A.R.Civ.P.
There being no evidence of conversion or fraud on behalf of any of the defendants, the conspiracy claim fails because there is no "actionable wrong" to support it. Purcell Co. v. SpriggsEnterprises, Inc., 431 So.2d 515 (Ala. 1983).
Therefore, there was no error in granting a summary judgment in favor of the defendants.
The judgment appealed from is affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, JONES and BEATTY, JJ., concur.
[1] First Southern Mortgage Corporation and First Southern Federal Savings and Loan Association of Mobile were also named as defendants, but were dismissed on motion of the plaintiff. *Page 168