**Charles ARLINE, Jr., Plaintiff,**

v.

**CITY OF JACKSONVILLE, et al., Defendants.**

**No. 3:03–CV–685J99HTS.**

United States District Court,
M.D. Florida,
Jacksonville Division.

Feb. 25, 2005.

---

Reginald Luster, Esquire, Dexter Van Davis, Esq., Luster & Davis, P.A., Jacksonville, FL, for Plaintiff Charles Arline, Jr.

Harvey L. Jay, III, Esq., Trudy E. Innes, Esq., Saalfield, Shad, Jay, Lucas & Stokes, P.A., Jacksonville, FL, for Brian P. Gilligan, M.D. and Brian P. Gilligan M.D., P.A.

Jon R. Phillips, Esq., Sean B. Granat, Esq., General Counsel's Office, City of Jacksonville, Jacksonville, FL, for City of Jacksonville and Detective Hinson.

## ORDER

ADAMS, District Judge.

This cause is before this Court on Defendant City of Jacksonville's ("the City") Motion for Final Summary Judgment (Dkt.39). Defendants Brian P. Gilligan and Brian P. Gilligan, M.D., P.A.'s (collectively "Gilligan") Motion for Summary Judgment and Amended Memorandum in support (Dkts.36, 38), Defendant Robert A. Hinson's ("Hinson") Motion for Final Summary Judgment (Dkt.40) and Arline's responses thereto (Dkts.50, 51). Upon consideration, after having reviewed the depositions, the affidavits, and exhibits in the record, this Court finds as follows:

Arline has sued, in the second amended complaint (Dkt.23), the City, Gilligan and Hinson. Arline sues the City in Count I, pursuant to 42 U.S.C. § 1983 for a violation of his Fourth Amendment rights based on an allegedly improper custodial interrogation, the results of which were used as a basis for Arline's arrest and prosecution. Count III, a claim against the City, is brought pursuant to 42 U.S.C. § 1983 for the violation of Arline's Fourth Amendment rights based on the City's policies and procedures related to transporting and releasing pre-trial detainees/defendants following acquittal at trial. Count IV is a claim against Gilligan and is brought pursuant to 42 U.S.C. § 1983 for the violation of Arline's Fourth Amendment rights based on Gilligan's alleged assistance to the authorities in securing Arline's arrest without a thorough investigation of the facts. Count V is a state claim for medical negligence against Gilligan. Count VI is a claim brought against Hinson pursuant to 42 U.S.C. § 1983 for the violation of Arline's Fourth Amendment rights based on an allegedly improper custodial interrogation, the results of which were used as a basis for Arline's arrest and prosecution.[1]

## I. Background Facts [2]

This case arises out of the tragic death of twenty-one month-old baby Justice Hires ("Justice"). The death occurred as a result of injuries Justice received on December 27, 2000, while in Arline's care. Arline was arrested for aggravated child abuse, and after the baby died, Arline was indicted for first-degree murder on February 8, 2001. Arline was tried and acquitted for Justice's murder in May 2003. This lawsuit followed.

On December 27, 2000, at approximately 8:15 p.m., Arline picked up Justice, his girlfriend's son, from daycare. Justice was healthy and exhibited no signs of trauma. Arline then drove to his apartment with the baby. Once inside the apartment, under Arline's sole care, Justice was fatally injured due to events that are in dispute by the parties.[3]

Jacksonville Fire and Rescue was dispatched to Arline's apartment as a result of a call to 911 by Arline, at approximately 8:44 p.m. Upon Rescue's arrival, Justice was unresponsive, not breathing and had no pulse. Arline told them Justice was not breathing, however Arline did not tell Res-

---

1. In a separate Order from this Court Counts II and VII of the second amended complaint were dismissed. (Dkt.57).

2. This Court's utilization of the word "facts" is solely for purposes of deciding the summary judgment motions and these are not necessarily the actual facts. *See Kelly v. Curtis,* 21 F.3d 1544, 1546 (11th Cir.1994) (citation omitted). The facts as stated are taken from the depositions, exhibits, and affidavits in the record. Where there are conflicts in the evidence, they are resolved for purposes of this motion in favor of Arline as the nonmoving party.

3. Arline is the only eyewitness to the events. Arline's version of the events is alleged in the second amended complaint, and will not be repeated in their entirety herein.

cue that he had dropped Justice on his head. Rescue intubated Justice and transported him to the Emergency Department of Baptist Wolfson Children's Hospital ("Hospital"). They arrived at the Hospital at approximately 9:21 p.m., where Justice received treatment from Dr. Brian Gilligan and the other members of the Hospital, including Dr. Mark Horton. Justice presented at the Hospital essentially brain dead—neurologically devastated. Gilligan noted that Justice's pupils were fixed and dilated, he had no rectal tone, he did not respond to painful stimuli, and he had no spontaneous movement. Gilligan and Horton examined Justice and found bilateral retinal hemorrhaging.[4]

Arline informed Gilligan that the baby was in good health when Arline pick him up from daycare. Arline provided a history of choking, which could explain a devastating neurological injury, but which would typically not explain the bilateral retinal hemorrhages.

Jacksonville Sheriff's Officer ("JSO") Dale M. Brannan was dispatched to the pediatric emergency room at the Hospital in reference to a possible aggravated child abuse with respect to Justice. When Brannan arrived at the hospital, he had a conversation with Gilligan, during which Gilligan briefed Brannan on the history obtained from Arline. While at the hospital, Brannan was told by medical personnel that a full medical examination, including x-rays and a CT scan, had been performed on Justice. Gilligan indicated that Justice was suffering from brain hemorrhaging and retinal hemorrhaging consistent with Shaken Baby Syndrome. Gilligan, further, indicated that the child had what appeared to be an old fracture on his rib on his left side, and a more recent fracture to a rib on his right side. Brannan called Sergeant C.L. Wilson, who then responded to the Hospital. Brannan briefed Wilson on

what he had learned. Thereafter, Wilson contacted the Homicide Division and Homicide Detective Hinson responded to the hospital. Wilson related the above-referenced facts to Hinson. The police also learned that Justice's father told them that he suspected Arline had abused Justice, but medical personnel had not found evidence of bruising and Justice's mother was unaware of Arline having been abusive in the past.

Arline was eventually asked if he would accompany Hinson to the Police Memorial Building ("PMB") in order to be interviewed. Arline voluntarily agreed to do so.

In his video deposition in July 2004, Arline testified about the circumstances surrounding the death of Justice and his subsequent interview and arrest. He did not recall whether he told Rescue that he dropped Justice on his head. Arline said that he did not remember talking to Gilligan or what he may have said. Arline claimed he told "somebody" at the hospital about dropping Justice on his head, but that he had no idea who it was. There is no evidence of this in any medical record.

Arline agreed to go to Hinson's office because he was being cooperative with Hinson's request. Arline had no problem with going to the PMB, and Arline had no idea that he was under suspicion for injuring Justice at the time he was asked to go to the PMB. Arline knew he was not under arrest. Arline was never handcuffed until after he signed the written statement. During the entirety of the interview, Arline never considered himself a suspect. Everything Arline said that night to Hinson was voluntary. Arline previously had his rights read to him when he was arrested for forgery and he been informed at

---

4. Bilateral retinal hemorrhages are suspicious for Shaken Baby Syndrome.

that time that he had a right to remain silent.

Arline is a high school graduate. He can read, write and had one year of college prior to his interview with Hinson. Arline is capable of doing college level work.

Arline admits that a JSO standard rights form was put in front of him before his interview started, but he "can't recall" if he had the opportunity to read it. Arline signed the rights form and initialed each of the six individual rights outlined on the rights form, but claims he did not read any of it or become aware of its contents. Arline never at any time that night asked for a lawyer and signed the rights form freely and voluntarily.

After the rights form was signed, the interview ensued. What Arline said at the interview verbally is in dispute. The Homicide Continuation Report contains the police account of what Arline said. Arline denies that he made any of the inculpatory statements described therein, but largely admits whatever the police say he said which is exculpatory or benefits him. Arline disputes that he ever said that he shook the baby, disputed that he told different stories, and said he did not mention dropping the baby on his head early in the interview because he was interrupted.

Eventually a written statement was prepared and Arline was asked to sign it. The statement is described in the second amended complaint as a false and fabricated confession. The narrative portion of the written statement contains 20 sentences. Each sentence in the statement contains at least one blank in it where Arline printed his name in his own hand. The first sentence in the statement is: I, *Charles Arline,* having been advised of my rights do give this written statement of my own free will. (Dkt.39, Ex. 2). Some of the sentences contain two blanks where Arline printed his own name in his hand.

Arline printed his name in the statement at least once for every sentence in it-a total of 22 times. Arline also initialed corrections in three places. Arline affixed his signature at the bottom of each of the three pages, directly under the typewritten phrase "STATEMENT MADE BY." *Id.*

The statement was written out in Arline's presence. The written statement was begun at 1:35 a.m. and was completed at about 2:27 a.m. The statement was placed in front of Arline right side up, not upside down. Arline says that he did not read the phrase "STATEMENT MADE BY" immediately above where he signed the statement in three places. Despite having initialed and signed the rights form, Arline maintains he was never advised of his rights. Arline refused to say whether he signed the written statement of his own free will, nor did he explicitly deny it.

There was never any threatening or hitting during the interview. Arline was never touched. Hinson was never mean or rude to Arline, except in one brief instance where Hinson was short with Arline. Arline continued to trust Hinson, and cooperate with him, before and after the instance of intimidation. Lack of sleep did not influence Arline to sign the written statement; when asked if lack of sleep induced him to do so, Arline replied "I signed it because that's what they asked me to do." (Dkt.39.Ex. 10(b), pg. 84).

Arline insists that he did not read what he signed, although he agreed that he "perused" it and "might have scanned it." (Dkt.39, Ex. 10(a), pgs. 66–70). When asked about printing his name twice within the sentence on page 2 of the statement admitting that he had indeed shaken Justice, Arline agreed that he did so in his own hand, but could not recall the extent to which he perused the sentence and was not aware that the word "shook" was in

the sentence. (Dkt.39, Ex. 10(b), Pgs. 84–85). Nor was Arline aware of "Shaken Baby Syndrome" at the time. (Dkt.39, Ex. 10(b), Pgs. 85–86). When asked about the fact that he had printed his name twice in the final sentence of the statement-the one indicating that he "shook" the baby "very hard"— Arline admitted that he had placed his name there but claimed he did not read it. (Dkt.39, Ex. 10(b), Pgs.105–08).

Arline claimed that he was not given the opportunity to write out his statement in his own hand, but did not remember every single thing Hinson said to him.

After the written statement was obtained, Hinson had a conversation with Medical Examiner Office personnel. The report reflects the forensic investigator's version of what Hinson reported to the Medical Examiner's Office. As recorded therein, the report reflects that Hinson accurately conveyed the substance of the written statement obtained from Arline. The report does say that Arline admitted shaking Justice "violently"; the written statement says "very hard." Arline admitted there is no difference between the two.

The second amended complaint contends that Hinson communicated false statements to the Medical Examiner's office regarding the content of Arline's admissions during the interview. What Hinson is claimed to have said to the Medical Examiner, however, mirrors the content of the written statement signed by Arline.

The cause of Justice's death was as the result of "closed head injuries," and "the manner of death [was] homicidal". (Dkt. 39, Ex. 14; Ex. 15, ¶ 4). Dr. Boehme has not expressed an opinion in this case about the cause of death; his report is completely silent about that.

With respect to Arline's post-acquittal detention claim, Arline's second amended complaint alleges a three hour detention. The affidavit of Tara Wildes, Chief of the Jails Division, shows that Arline was released less than two hours and twenty-three minutes from the moment the verdict was returned. Further, there are no facts in the record indicating that JSO has a custom or policy of detaining releasees for an unreasonable length of time.

## II. Standard of Review

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56. The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Once the movant has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed. R.Civ.P. 56(e)).

This Court recognizes that it may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers National Life Ins. Co.,* 906 F.2d 559, 564 (11th Cir.1990). A dispute about a material fact is genuine, and summary judgment is inappropriate, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Haves v. City of Miami,* 52 F.3d 918, 921 (1995).

Of course, the district court must view all evidence most favorably toward the non-moving party, and all justifiable inferences are to be drawn in the nonmoving party's favor. *Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1313 (11th Cir.1999). If the district court finds, under the relevant standards, that reasonable jurors could find a verdict for the nonmoving party since a disputed factual issue exists, judgment should be denied. However, there must exist a conflict in substantial evidence to pose a jury question. *Walker v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1555 (11th Cir. 1995) (quoting *Verbraeken v. Westinghouse Electric Corp.*, 881 F.2d 1041, 1045 (11th Cir.1989)).

## III. Legal Analysis

This Court will address the arguments of the parties in the following order: The City; Hinson; and Gilligan.

### A. The City

#### 1) Count I

 Count I is brought pursuant to 42 U.S.C. § 1983 for a violation of Arline's Fourth Amendment rights based on an allegedly improper custodial interrogation, the results of which were used as a basis for Arline's arrest and prosecution. The City presents what is known as a *Monell-*immunity defense.[5] Under *Monell*, there can be no respondeat superior theory of liability for section 1983 actions against municipalities, *Monell*, 436 U.S. at 691, 98 S.Ct. 2018; "municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, 'that is, acts which the municipality has officially sanctioned or ordered.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (citation omitted). Thus, a munici-

pality may be held liable for constitutional torts when it can be shown that the tort was caused by the execution of an express municipal policy, or caused by a widespread municipal custom or practice that constitutes a "custom or usage" that has the force of law. *City of St. Louis*, 485 U.S. at 127, 108 S.Ct. 915 (1988) (citations omitted); *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Here, Arline fails to point to any evidence of an express policy that condones Hinson's alleged actions of which Arline complains. Arline has provided evidence, however, which necessitates the granting of the City's motion as to Count I.

With respect to police practices and evidence of the City's customs, practices and policies, the plaintiff retained Michael Cosgrove. Cosgrove's deposition transcript reveals that there is no deficiency in the City's official policies or rules. Cosgrove testified that JSO is accredited by CALEA and the State of Florida and complies with all 924 of the CALEA standards as well as 21 additional state standards. (Dkt.39, 11(a), pgs. 44,57) In Cosgrove's opinion, JSO is organized in such a way as to provide supervision and command level oversight consistent with customary and approved police practices. (Id. at 60). Cosgrove believes that the main deficiency in this case is that the interview was not taped.(Id.). He also feels that Arline should have been provided with an opportunity to write out his own statement, but he arrived at this opinion without having read any of Hinson's testimony or any of Arline's deposition. (Id. at 18, 61–62). Cosgrove is unaware of anything in constitutional law or in authoritative source material that requires suspects must be pro-

---

5. *Monell v. Dep't of Social Serv. of N.Y.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

vided with an opportunity to write their own statements. (Id. at 62; Dkt. 39, Ex. 11(b), pgs. 85–86). Assuming Arline is telling the truth, Cosgrove believes Hinson's alleged conduct violated JSO's clear policies prohibiting such behavior. (Dkt, 39, Ex. 11(b), pgs. 90–91). Beyond not requiring taping and not disciplining Hinson, he knows of no custom or practice contributing to constitutional rights violations as described in the complaint. (Id. at 90–92).

Furthermore, there is absolutely no evidence of a custom or practice of providing false or altered information to the medical examiners office to bolster false confessions. In fact, the evidence affirmatively shows that Hinson's communications with the Medical Examiner's office did not influence the Medical Examiner at all. (Dkt.39, Ex. 14, ¶ 5). Accordingly, the City cannot be held responsible for this alleged Constitutional tort, and summary judgment is due to be granted on Count I in the City's favor.

### 2) Count III

█ Arline alleges the City violated of his Fourth Amendment rights based on the City's policies and procedures related to transporting and releasing pre-trial detainees/defendants following acquittal at trial. In particular Arline claims in the second amended complaint,

> The Defendant City of Jacksonville, its Department the Jacksonville Sheriff's Office, its employees and agents, within the scope of their authority and under the color of state law, knowingly, intentionally and recklessly deprived [Plaintiff] of his constitutional rights and privileges guaranteed by the Fourth Amendment, including the right to be free from unreasonable searches, seizures, arrest and detention, by adopting a policy, custom and practice of:

> A) seizing, handcuffing, arresting and detaining defendants, including [Plaintiff] in the Duval County jail for several hours before releasing him although he had been acquitted of all criminal offenses by a jury.

(Dkt.23, ¶ 64).

Wildes, the Chief of the Jails Division of the Jacksonville Sheriff's Office, reviewed the jail records for Arline and determined that Arline was released "from jail no more than 2 hours and 23 minutes after the jury returned to the courtroom to return its verdict, and probably less than 2 hours after he returned to the jail." (Dkt 39, Ex. 17, ¶ 4). Wildes indicated that the custom of the JSO is to return acquitted defendants to the jail "where [they are] processed out and released as expeditiously as possible." (Dkt 39, Ex. 17, ¶ 5). Finally, Wildes maintains that defendants who are acquitted are "free to request the presiding judge to order their immediate release, and there were defendants who were released from the courtrooms as a result." (Dkt ? ?, Ex. 17, ¶ 6).

Arline asserts that following the acquittal he was detained against his will and returned to jail. Specifically, Arline maintains, "[a]fter the jury acquitted me. I did not consent, and my attorneys objected, to the Jacksonville Sheriff [sic] Office directing me to put on inmate clothing, shackling my hands and feet and parading me through the halls of the courthouse in front of the public, my family, friends and attorneys." (Dkt.52, Ex. 11, ¶ 10).

It is the City's position that a brief delay associated with the administrative release of a detainee such as Arline has been determined not to be unreasonable. For support, the City points this Court to *Brass v. County of Los Angeles,* 328 F.3d 1192 (9th Cir.2003), in which the plaintiff was detained in jail for thirty-nine hours after his release was ordered by the court.

The Ninth Circuit concluded Brass had not stated a valid claim under § 1983 since the policy of which he complained did not violate Brass' constitutional rights. Specifically, the Court concluded:

Brass may have had a due process right to be released within a reasonable time after the reason for his detention ended. The question here, however, is whether the County denied him that right because its policy or custom of processing court-ordered releases only after it has processed all other releases increased by an indeterminate amount the delay between the court order and his actual release.

Brass did not have a constitutional right to have his release papers processed in any particular order or ahead of other prisoners whose papers the Sheriff's Department received the same day as his. The order in which the Sheriff's Department handles prisoner releases is an administrative matter primarily within the Department's discretion. We know of no requirement, constitutional or otherwise, that the Department process release papers in the precise order in which it receives them, or process court-ordered releases ahead of all others. In these circumstances, we cannot say that to the extent that the 39–hour delay in releasing Brass resulted from that policy or custom, it violated his constitutional right to due process of law.

*Brass,* 328 F.3d at 1200 (internal citations omitted).

Arline, on the other hand, points to *Jones v. Cochran,* No. 92–6913, 1994 U.S. Dist. LEXIS 20625 (S.D.Fla. Aug. 8, 1994), for support of the proposition that the facts of this case amount to a violation of the Fourth Amendment.

In *Jones* former detainees of the Sheriff of Broward County brought a class action complaint based upon allegations that they were handcuffed and detained following acquittal at a state court trial on criminal charges. The plaintiffs asserted, among other claims, that their unlawful seizure violated the Fourth Amendment. The *Jones* court concluded: "the practice of post-acquittal detention as practiced by the Broward County Sheriff violated the Fourth Amendment to the United States Constitution." *Jones,* 1994 U.S. Dist. LEXIS 20625, at *7. In addition, the *Jones* court address Florida Rule of Criminal Procedure 3.690 [6] and concluded "the rule contains mandatory language which requires the immediate discharge of such individuals [acquittees absent other pending charges]." *Jones,* 1994 U.S. Dist. LEXIS 20625, at *9. The *Jones* analysis is specifically cogent in light of the analysis of Rule 3.690 and since Arline cites the rule too in support of his claim.

This Court, moreover, finds the analysis of *Lewis v. O'Grady,* 853 F.2d 1366 (7th Cir.1988) persuasive. The question before the Seventh Circuit in *Lewis* pertained to "the reasonableness of a delay in the release of a defendant from custody after the basis for his detention had ended." *Lewis,* 853 F.2d at 1367. Sandy Lewis, the plaintiff, was mistakenly arrested on a warrant for another individual. When the error was learned, the judge at Lewis' first appearance apologized for the "mix-up." *Id.* at 1368. Nevertheless, Lewis remained in custody for approximately another eleven hours. Lewis subsequently sued for false imprisonment under § 1983. The Seventh Circuit determined that while administrative tasks required to process a prisoner may take some time, it was ultimately

---

**6.** Rule 3.690 provides: When a judgment of not guilty is entered, the defendant, if in custody, shall be immediately discharged unless the defendant is in custody on some other charge. If the defendant is at large on bail, the defendant's sureties shall be exonerated and, if money or bonds have been deposited as bail, the money or bonds shall be refunded.

concluded that it was "for the jury to determine whether the 11 hours it took the sheriff to discharge Lewis was reasonable." *Lewis,* 853 F.2d at 1370.

This Court concludes, with the analysis of *Lewis* and *Jones* in mind, that what is presented before this Court is a jury question as to whether or not Arline's approximately two and a half hour detention following his acquittal on all criminal charges violated the Fourth Amendment. Due to this conclusion, this Court will not express an opinion as to whether or not a custom or practice existed.

## B. Hinson

### 1) Count VI

■ Count VI alleges a violation of the Fourth Amendment by alleging that Hinson did not videotape the interview of Arline so that he could fabricate Arline's confession. Count VI also avers that Hinson lied to the Medical Examiner's Office about Arline's interview thus causing the State of Florida to prosecute Arline. Hinson maintains that probable cause existed for Arline's arrest apart from the information elicited from Arline by Hinson during the interrogation and therefore no liability under § 1983 can exit.

■ "Plainly, an arrest without probable cause violates the right to be free from an unreasonable search under the Fourth Amendment." *Durruthy v. Pastor,* 351 F.3d 1080, 1088 (11th Cir.2003). However, the existence of probable cause is an absolute bar to a § 1983 action for a Fourth Amendment violation. *L.S.T. v. Crow,* 49 F.3d 679, 685 (11th Cir.1995).

> Under federal law, probable cause to arrest exists "when an arrest is 'objectively reasonable based on the totality of the circumstances.'" *McCormick v. City of Fort Lauderdale,* 333 F.3d 1234, 1243 (11th Cir.2003) (quoting *Ferraro,* 284 F.3d at 1195). "This standard is met when the facts and circumstances

within the *officer's knowledge,* of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.* (internal citation and quotation marks omitted).

*Durruthy,* 351 F.3d at 1088.

> We add that officers who make an arrest without probable cause are still "entitled to qualified immunity if there was arguable probable cause for the arrest." *Jones v. Cannon,* 174 F.3d 1271, 1283 (11th Cir.1999) (citing *Lindsey v. Storey,* 936 F.2d 554, 562 (11th Cir.1991)). Arguable probable cause exists when "an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed." *Montoute v. Carr,* 114 F.3d 181, 184 (11th Cir.1997); *see also Jones,* 174 F.3d at 1283.

*Durruthy,* 351 F.3d at 1089.

The following information was available to Hinson prior to his interview of Arline. Sgt. Wilson had been summoned to the hospital at the behest of the hospital staff on a suspected case of child abuse. Sgt. Wilson informed Hinson that Justice's injuries had been sustained in a "nonaccidental way." (Dkt.45, Ex. C, Pgs.8–9). Hinson soon learned that Justice had a what appeared to be an old fracture of a rib on his left side and a more recent fracture to a rib on his right side. Hinson learned Justice had "massive internal head bleeding or hemorrhaging in the brain" (Dkt.39, Ex. 12(a), pg. 326). Hinson was informed that Justice's father suspected Arline of abusing the child. Justice had been severely injured while in the sole custody of Arline. Further, Justice suffered from "brain hemorrhaging and retinal hemorrhaging, which [was] consistent with 'shaken baby syndrome.'" (Dkt.39, Ex. 7, ¶ 5).

This Court concludes that the above information was sufficient to establish probable cause for Hinson to arrest Arline on the charge of aggravated child abuse prior to Arline's interrogation as the PMB. Hence, Arline is unable to sustain a § 1983 claim against Hinson and summary judgment is due to be granted. *L.S.T.,* 49 F.3d at 685.

Moreover, even assuming, *arguendo,* that probable cause did not exist, arguable probable cause certainly existed for Arline's arrest. If arguable probable cause existed for Arline's arrest then Hinson is shielded by qualified immunity.

> [A]ll that is required for qualified immunity to be applicable to an arresting officer is *"arguable* probable cause to believe that a person is committing a particular public offense," *Redd v. City of Enterprise,* 140 F.3d 1378, 1384 (11th Cir.1998); "that is, where 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest' the plaintiffs," *id.* at 1382 (citation omitted).

*Scarbrough v. Myles,* 245 F.3d 1299, 1302 (11th Cir.2001). Hinson's actions, therefore, are shielded by qualified immunity. *Durruthy,* 351 F.3d at 1089; *Scarbrough.*

## C. GILLIGAN

### 1) Count IV

In Count IV of the second amended complaint, Arline maintains that Gilligan and the other defendants in this action deprived Arline of his Constitutional rights under the Fourth Amendment. Specifically, Arline contends Gilligan contacted the authorities and reported that Justice had been a victim of child abuse without first: 1) obtaining a history of the accident involving Justice from Arline; 2) ordering a CT scan of Justice's head; and 3) by failing to observe "bruises during the physical examination that were indicative of the child being physically abused or violently shaken by an adult." (Dkt.23, pg.15). Arline maintains that Gilligan committed these acts "both under color of state law and in concert with" the other Defendants in this action. *Id.*

"To maintain a 42 U.S.C.A. § 1983 action, the conduct complained of must have been committed by a person acting under color of state law and must result in a deprivation of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Bendiburg v. Dempsey,* 909 F.2d 463, 468 (11th Cir. 1990). A private defendant,

> can be held liable in a § 1983 action if they act in concert with the state officials in depriving a plaintiff of constitutional rights. Only in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes. The Eleventh Circuit recognizes three tests for establishing state action by what is otherwise a private person or entity: the public function test, the state compulsion test, and the nexus/joint action test.

*Harvey v. Harvey,* 949 F.2d 1127, 1130 (11th Cir.1992)(internal citations omitted). "The public function test is narrow, covering private actors who perform functions that are traditionally the exclusive prerogative of the state. *Id.* The Supreme Court has emphasized that a mere showing that a private person performs a public function is not enough to establish state action." *Langston By and Through Langston v. ACT,* 890 F.2d 380, 384 (11th Cir.1989). "The state compulsion test asks whether the state has exercised coercive power or has provided such significant encouragement, either overt or covert, that the private actor's choice must be deemed to be that of the state." *Id.* "Under the nexus/joint-action test, the Court asks whether the state has intertwined itself with the

private actor to such an extent that the state was a joint participant in the enterprise." *Langston,* 890 F.2d at 385.

The Eleventh Circuit has provided the following regarding what an individual plaintiff must demonstrate to prove a conspiracy under § 1983 in order to satisfy the nexus/joint-action test,

> The plaintiff attempting to prove such a conspiracy must show that the parties "reached an understanding" to deny the plaintiff his or her rights. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970); *Strength [v. Hubert.* ], 854 F.2d [421] at 425 [ (11th Cir.1988) ] (citations omitted). The conspiratorial acts must impinge upon the federal right; the plaintiff must prove an actionable wrong to support the conspiracy. *Sadie v. Martin,* 468 So.2d 162, 167 (Ala.1985); *Strength,* 854 F.2d at 425. *N.A.A.C.P. v. Hunt,* 891 F.2d 1555, 1563 (11th Cir.1990). In *Adickes,* 398 U.S. at 155–56, 90 S.Ct. at 1607 (1970), the Supreme Court concluded "that the acts of a private party are fairly attributable to the state on certain occasions when the private party acted in concert with state actors."

*Bendiburg,* 909 F.2d at 468.

> The plaintiff does not have to produce a "smoking gun" to establish the "understanding" or "willful participation" required to show a conspiracy, *Bendiburg v. Dempsey,* 909 F.2d 463, 469 (11th Cir.1990), but must show some evidence of agreement between the defendants. *Bailey v. Bd. of County Comm'rs of Alachua County,* 956 F.2d 1112, 1122 (11th Cir.1992) ("The linchpin for conspiracy is agreement, which presupposes communication."). For a conspiracy claim to survive a motion for summary

judgment "[a] mere 'scintilla' of evidence ... will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir. 1990).

*Rowe v. City of Fort Lauderdale,* 279 F.3d 1271, 1283–84 (11th Cir.2002).

In the instant matter, there is no evidence that the parties reached any understanding to deprive Arline of his constitutional rights. In fact, Gilligan maintains he "never met Detective Hinson prior to December 27, 2000," and that "he never met any of the other responding officers who came to Baptist Emergency Department December 27, 2000, prior to their appearance at the Emergency Department." (Dkt.44, Affidavit, ¶¶ 8,9). Nor is there any evidence that the parties reached an agreement to falsify Arline's confession so as to lead to Arline's improper prosecution. *Lowe v. Aldridge,* 958 F.2d 1565, 1573 (11th Cir.1992). Arline appears only to be asserting that a conspiracy existed between Gilligan and the other Defendants to deprive him of his Constitutional rights and on that basis this Court concludes that summary judgment is due to be granted for Gilligan as to Count IV.

However, even assuming, *arguendo,* that Arline attempt to maintain a § 1983 action under a state compulsion argument that assertion too must fail. This Court recognizes that merely alerting the authorities and providing information that may lead to an arrest is not sufficient to convert a private persons actions into public action. *Benavidez v. Gunnell,* 722 F.2d 615, 618 (10th Cir.1983). Furthermore, the sole evidence to which Arline arguably points [7] to demonstrate state

---

**7.** Arline arguably references state compulsion in the following response to Gilligan's Motion for summary judgment: "Dr. Gilligan contends that he is entitled to immunity because

he acted pursuant to Section 39.201, Florida Statutes, which requires him to report child

compulsion is in referencing Section 39.201(1)(a), Florida Statutes.[8] This Court, nevertheless, finds such an assertion unpersuasive and insufficient to meet the state compulsion test. *See Haag v. Cuyahoga County*, 619 F.Supp. 262 (N.D.Ohio 1985)(concluding that a doctor could not be held liable under § 1983 since he was not a state actor despite a statue requiring mandatory reporting of child abuse by professionals). Accordingly, this Court concludes that Gilligan's motion is due to be granted as to Count IV.

In addition, this Court feels compelled to express concern over the type of action Arline seeks to bring. Under both a broad reading of § 39.201(1)(a) and Arline's theory of this case it would appear that any individual who reports suspected child abuse is subject to potential § 1983 liability. This Court is unwilling to read into the statute such an expansive scope.

### 2) Count V

Count V is a state claim for medical negligence against Gilligan. Arline sets forth Gilligan's alleged duty in the following matter: Gilligan "owed to [Arline] a duty to exercise reasonable care in making a medical determination of child abuse having provided medical care and treatment of Justice Hires, a minor child." (Dkt.23, ¶ 72). The alleged breach of that duty occurred when Gilligan instructed someone to call the authorities regarding Justice's condition without: 1) obtaining a history of the accident involving Justice from Arline; 2) ordering a CT scan of

Justice's head; and 3) by failing to observe "bruises during the physical examination that were indicative of the child being physically abused or violently shaken by an adult." (Dkt.23, pgs.16–17). The resulting causation and damages are explained as the following: "[a]s a direct and proximate result of [Gilligan's] medical negligence. [Arline] sustained injuries and damages including the deprivation and reckless disregard of his constitutional rights and privileges guaranteed by the Fourth and Fifth Amendment ...." (Dkt.23, ¶ 73).

Gilligan asserts three reasons for the granting of the motion for summary judgment as to Count V. First, Gilligan argues that he had a duty to Justice, but not Arline. Second, Gilligan asserts that the statute of limitations precludes Arline's claim. Finally, Gilligan maintains his care of Justice was reasonable and appropriate. This Court will address each of Gilligan's arguments in turn.

█ Gilligan stresses that Arline is not a blood relative of Justice, that Gilligan never treated Arline and that Arline is not claiming that Justice suffered any damages as a result of Gilligan's actions or lack thereof. Gilligan in essence maintains that he owed no duty of care to Arline. Arline, on the other hand, points to *Pate v. Threlkel*, 661 So.2d 278 (Fla.1995) as establishing that Arline was owed a duty by Gilligan under the facts of this case.[9]

In *Pate*, a patient's adult child brought a medical malpractice action based on a physicians' failure to warn patient that the

---

abuse and grants immunity if it is reported in good-faith." (Dkt.50, pg.18).

8. Section 39.201(1)(a), Florida Statutes, provides:

[a]ny person who knows, or has reasonable cause to suspect, that a child is abused, abandoned, or neglected by a parent, legal custodian, caregiver, or other person responsible for the child's welfare, as defined

in this chapter, shall report such knowledge or suspicion to the department in the manner prescribed in subsection (2).

9. Arline also point to cases from New York and Colorado when seeking to establish that Gilligan owes a duty of care to Arline. However, this is a matter of Florida state law and this Court is unwilling to rely upon such cases addressing other state laws.

condition was genetically transferable and that her children should be tested for that condition.[10] The Supreme Court of Florida was presented with the following question, certified to be of great public importance: "Does a physician own a duty of care to the children of a patient to warn the patient of the genetically transferable nature of the condition for which the physician is treating the patient?" *Pate*, 661 So.2d at 279. In answering the question in the affirmative, the Court addressed two questions related to a physician's duty. First the Court concluded that a duty would exist if "the statutory standard of care requires a reasonably prudent health car provider to warn a patient of the genetically transferable nature of the condition for which the physician was treating the patient." *Pate*, 661 So.2d at 280. Second, the Court concluded "when the prevailing standard of care creates a duty that is obviously for the benefit of certain identified third parties and the physician knows of the existence of those third parties, then the physician's duty runs to those third parties." *Pate*, 661 So.2d at 282. Finally, in determining how a physician satisfies such a duty, the Court concluded "in any circumstances in which the physician has a duty to warn of a genetically transferable disease, that duty will be satisfied by warning the patient." *Id.*

It is critical for this Court to note the facts of *Pate* are distinguishable from those before this Court. This is not a situation in which children of a patient are not being provided information with regard to a genetically transferable condition which if located early could be treated. Importantly, too, this is not a situation in which a genetically transferable disease was presenting itself. Rather in this

cause, Gilligan correctly diagnosed Justice's injuries and such a diagnosis is a critical difference in this matter. Finally, this Court finds it important that the Supreme Court of Florida determined that in order to fulfill the duty, the physician was simply required to notify the patient. Such action could not have alleviated the situation in this cause. Hence, *Pate* is distinguishable and does not require a determination that a duty is present in this cause. As such this Court determines that Gilligan owed no duty to Arline, and that summary judgment is due to be granted as to Count V as a matter of law.

Furthermore in each of the cases Arline cites from other states there is a blood relationship present. *Caryl S. v. Child and Adolescent Treatment Services, Inc.,* 161 Misc.2d 563, 614 N.Y.S.2d 661 (N.Y. 1994); *Montoya v. Bebensee,* 761 P.2d 285 (Colo.App.1988). There is no such relationship present in this case, even if this Court were to be persuaded by cases not addressing Florida law.

Gilligan maintains that his care of Justice was reasonable and appropriate. Arline's negligence action against Gilligan is premised upon a novel claim. Arline's claim is not that Justice was somehow harmed in the treatment provided by Gilligan. No, in fact, it cannot be since the experts in this matter, Arline's included, are clear that Gilligan rendered care which did not fall below the standard of care. (Dkt. 45, Ex. A, pgs. 20–22; Dkt. 45, Ex. B, pg. 4). No, Arline's claim is more unique. The claim is that Gilligan rendered medical negligence by jumping to a conclusion that Justice's injuries had been sustained as the result of child abuse and alerting the authorities based on that "knee-jerk" response.

---

**10.** The procedural posture of the issues facing the Court in *Pate* were on appeal from a order granting the physicians' motion to dismiss. *Pate*, 661 So.2d at 281. Hence, the Court was required to accept as true all the allegations of the complaint; such a situation is not before this Court.

However, what Arline misses in this accusation is the elements for a claim of medical negligence. In Florida.

[t]o prevail in a medical malpractice case, a plaintiff must establish the standard of care owed by the defendant, the defendant's breach of the standard of care, and that such breach proximately caused the alleged damages. *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So.2d 1015, 1018 (Fla.1984). "In negligence actions, Florida courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiff's injury." *Id.* In *Gooding*, the supreme court quoted Prosser on this standard of proof: [The plaintiff] must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant. *Id.* (quoting William Prosser, *Law of Torts* § 41 (4th ed.1971) (footnotes omitted)).

*Jackson County Hosp. Corp. v. Aldrich,* 835 So.2d 318, 327–28 (1st DCA 2002).

What is the duty Arline points to; that doctors in emergency rooms must be "extremely sensitive to the legal aspects of the potential criminal cases by reporting medical facts and rendering opinions only after a thorough evaluation has been completed." (Dkt.50, pg.13). Gilligan allegedly breached that duty when without obtaining a complete work up and history for Justice, including a history of the event from Arline, Gilligan notified the authorities without a reasonable suspicion of child abuse. Even assuming, *arguendo*, that these are legitimate duties and breaches,[11] there is no causation to Justice. Justice's brief care while he was in the Hospital being treated by Gilligan has not been assailed. To the contrary, it has been praised. (Dkt. 45, Ex. A, pgs. 20–22; Dkt. 45, Ex. B. pg. 4). While under the facts of this case Arline may have some cause of action against Gilligan, medical malpractice is not such a claim available to him. Accordingly, this Court concludes that summary judgment is due to be granted for Gilligan as to Count V.

However, even assuming, *arguendo*, that a duty and a claim of negligence existed this Court will continue addressing Gilligan's claims. Gilligan maintains that Arline's action is barred by the statute of limitations. Section 95.11, Florida Statutes, provides a two year window for claims of medical negligence, and that window closed on December 28, 2002, according to Gilligan.[12] In the alternative, Gilligan avers that the window for the statute of limitations period could have opened on February 26, 2001, the date Arline is "presumed to have learned of the instant claim from the State of Florida's Response to Demand for Discovery in Arline's criminal case."[13]

---

11. This Court finds such an assumption highly spurious. In fact, Arline has pointed to no Florida case law which would support such a duty and breach as alleged in the second amended complaint.

12. Gilligan maintains that since Arline was arrested on December 28, 2000, and charged with aggravated child abuse, Arline was placed on notice of the injury caused by the alleged medical negligence on that date. Two years later, December 28, 2002, is prior to Arline's filing of a Notice of Intent which was not filed until December 17, 2003.

13. Two years from February 26, 2001, is according to Gilligan February 26, 2003, also prior to Arline's Notice of Intent filed on December 17, 2003.

Arline, on the other hand, contends that he "did not know [Gilligan] had notified the police without having completed a thorough evaluation, without having obtained a history of the event and not having sufficient knowledge and/or experience in the particular field to render such an opinion to the police until the trial in this case in May of 2003." (Dkt.50, pg.17).

In *Tanner v. Hartog, M.D.,* 618 So.2d 177 (Fla.1993) the Supreme Court of Florida held:

> Knowledge of the injury as referred to in the rule [the medical malpractice provision found in section 95.11(4)(b), Florida Statutes] as triggering the statute of limitations means not only knowledge of the injury but also knowledge that there is a reasonable possibility that the injury was caused by medical malpractice. The nature of the injury, standing alone, may be such that it communicates the possibility of medical negligence, in which event the statute of limitations will immediately begin to run upon discovery of the injury itself. On the other hand, if the injury is such that it is likely to have occurred from natural causes, the statute will not begin to run until such time as there is reason to believe that medical malpractice may possibly have occurred.

*Tanner,* 618 So.2d at 181–82.

This Court concludes that if Arline's instant claim were for negligence that it would be barred by the statute of limitations. Arline was aware that the nature of the injury was sufficient to establish the possibility of medical negligence, and hence this action would be precluded by the statute of limitations if it were in fact a true claim of medical negligence.

Accordingly, it is **ORDERED**:

1. Defendant City of Jacksonville's Motion for Final Summary Judgment (Dkt.39) is **GRANTED in Part.**

2. Defendant Hinson's Motion for Final Summary Judgment (Dkt.40) is **GRANTED.**

3. Defendants Brian P. Gilligan and Brian P. Gilligan. M.D., P.A.'s (collectively "Gilligan") Motion for Summary Judgment is **GRANTED.**

4. The Clerk is **DIRECTED** to enter **JUDGMENT** in favor of Hinson and Gilligan as to Arline's claims against them.